INDIANA PUBLIC RETIREMENT SYSTEM, Indiana State Teachers' Retirement Fund, Indiana Public Employees' Retirement Fund, Plaintiffs–Appellants,

City of Westland Police and Fire Retirement System, on Behalf of Itself and All Others Similarly Situated, Locals 302 and 612 of the International Union of Operating Engineers–Employ-

ers Construction Industry Retirement Fund, on Behalf of Themselves and All Others Similarly Situated, IBEW Local Union No. 58 Annuity Fund and the Electrical Workers Pension Trust Fund of IBEW Local Union No. 58, Plaintiffs,

v.

SAIC, INC., Mark W. Sopp, Walter P. Havenstein, Defendants–Appellees,

Gerard Denault, Kenneth C. Dahlberg, Deborah H. Alderson, Defendants.

Docket No. 14–4140–cv.

United States Court of Appeals, Second Circuit.

Argued: Oct. 6, 2015.

Decided: March 29, 2016.

Douglas Wilens, Robbins Geller Rudman
& Dowd LLP, Boca Raton, FL; Samuel
H. Rudman, Joseph Russello, Sean T.
Masson, Robbins Geller Rudman & Dowd
LLP, Melville, NY, for Plaintiffs–Appellants.

Andrew S. Tulumello (Jason J. Mendro, on the brief), Gibson, Dunn & Crutcher LLP, Washington, DC; Eric Robert Delinsky, Zuckerman Spaeder LLP, Washington, DC for Defendants–Appellees SAIC, Inc. and Mark W. Sopp.

Mark Filip, P.C., Vikas Didwania, Kirkland & Ellis LLP, Chicago, IL; Beth A. Williams, Emily P. Hughes, Kirkland & Ellis LLP, Washington, DC for Defendant–Appellee Walter P. Havenstein.

Before: LYNCH, LOHIER, and CARNEY, Circuit Judges.

LOHIER, Circuit Judge:

The Indiana Public Retirement System, the Indiana State Teachers' Retirement Fund, and the Indiana State Public Employees' Retirement Fund, on behalf of themselves and a class of other similarly situated investors ("Plaintiffs"), appeal from an order of the United States District Court for the Southern District of New York (Batts, *J.*) denying their motions to vacate the judgment and to amend their complaint. Plaintiffs sued SAIC, Inc.;[1] Walter P. Havenstein, its Chief Executive Officer; Mark W. Sopp, its Chief Financial Officer; and others (collectively, "Defendants") for securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b–5, 17 C.F.R. § 240.10b–5. Their lawsuit arose from a series of alleged material misstatements and omissions in SAIC's public filings regarding its exposure to liability for employee fraud in connection with SAIC's contract work for New York City's CityTime project. On appeal, we address principally four issues arising from Plaintiffs' motion to file a Proposed Second Amended Complaint ("PSAC"): (1) SAIC's alleged failure to comply with Generally Accepted Accounting Principles ("GAAP") by failing to disclose appropriate loss contingencies associated with the CityTime project, in violation of Financial Accounting Standard No. 5 ("FAS 5"); (2) SAIC's alleged failure to disclose a known trend or uncertainty reasonably expected to have a material impact on its financial condition, in violation of Item 303 of SEC Regulation S–K, 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303");[2] (3) SAIC's scienter; and (4) among other remaining issues, SAIC's allegedly misleading statements regarding its commitment to ethics and integrity contained in its 2011 Annual Report to shareholders.

We conclude that the District Court improperly denied Plaintiffs' postjudgment motion to amend their FAS 5 and Item 303 claims based on SAIC's March 2011 Form 10–K. We therefore vacate the District Court's order denying the motion with respect to those claims and remand for further proceedings consistent with this opinion. We affirm the judgment of the District Court with respect to Plaintiffs' remaining claims.

## BACKGROUND

We accept as true the facts alleged in the PSAC because Plaintiffs appeal from the denial of leave to amend on the ground of futility. *See In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 641–42 (2d Cir. 2015).

---

1. SAIC is now known as Leidos Holdings, Inc.

2. Regulation S–K required SAIC's periodic reports to the SEC, including its reports on Forms 10–K and 10–Q, to contain a section devoted to "management's discussion and analysis of the financial condition and results of operations." 17 C.F.R. § 229.303(a)-(b).

## 1. Facts

SAIC provided defense, intelligence, homeland security, logistics, and other services primarily to government agencies. In 2000 SAIC became the prime government contractor on a project with New York City to develop and implement an automated timekeeping program known as CityTime for employees of various City agencies. SAIC anticipated that the project, if successful, would attract business from municipalities across the United States with similar timekeeping requirements and would lead to contracts unrelated to timekeeping in the City. As a result, SAIC kept a close eye on the project's progress.

In 2002 SAIC hired Gerard Denault as Deputy Program Manager in charge of the CityTime project. In 2003 Denault enlisted Technodyne, a small, relatively unknown company, to provide staffing services on the project, but the relationship soon gave rise to an elaborate kickback scheme in which Technodyne illegally paid Denault and Carl Bell (SAIC's Chief Systems Engineer) for each hour a Technodyne consultant or subcontractor worked on CityTime. The scheme encouraged Denault and Bell to hire more Technodyne workers than the project required and to inflate billable hours and hourly rates.

Although SAIC initially suffered large losses under the CityTime contract, the contract became profitable in 2006 after Denault negotiated an amendment to the contract that transferred the risk of any cost overruns to the City. As a result of the amendment and the cost overruns associated with the kickback scheme, SAIC billed the City approximately $635 million for CityTime through May 2011, well over the $63 million that the City initially budgeted for the contract.

By late 2010, when the scheme began to unravel, SAIC had removed Denault from the CityTime project, placed him on administrative leave, and hired an outside law firm to conduct an internal investigation of possible fraud with the help of SAIC's internal auditors, who were tasked with reviewing Denault's timekeeping practices. At the same time, then-Mayor Michael Bloomberg announced that he was reevaluating SAIC's role in the CityTime project and reviewing whether to seek recovery of the City's payments to SAIC in connection with that project. On March 9, 2011, SAIC's audit team reported the results of its findings regarding Denault's improper timekeeping practices to SAIC.

Notwithstanding the audit team's findings, SAIC's Form 10–K, filed on March 25, 2011, and certified by Sopp and Havenstein, did not disclose SAIC's potential liability related to the CityTime project. To the contrary, in a separate Annual Report to shareholders that same month, SAIC touted its commitment to high standards of "ethical performance and integrity." Joint App'x 252. By the end of May 2011, though, Denault, Bell, the Technodyne principals, and others were charged in a federal criminal complaint with defrauding the City.[3] The charges, together with the results of the internal investigation from March 2011, prompted SAIC to fire Denault in May 2011 and offer to repay the City the amount he had billed after the 2006 amendment of the CityTime contract—a total of $2.5 million.

Thereafter, in a Form 8–K filed with the SEC on June 2, 2011, SAIC finally dis-

---

3. Bell was interviewed about the CityTime project by SAIC's in-house and outside counsel on January 24, 2011, resigned from SAIC that same day, and pleaded guilty in June 2011, while Denault was arrested in May 2011 and was ultimately convicted. The indicted Technodyne principals fled to India.

closed that. the United States Attorney's Office for the Southern District of New York (the "Government") and the New York City Department of Investigation ("DOI") were conducting a joint criminal investigation into the CityTime contract. The 8–K further disclosed that SAIC had billed a total of $635 million for the City-Time project, that it had $40 million in outstanding receivables, that Denault had been arrested for fraud, and that SAIC had offered to refund the City the $2.5 million that Denault billed as part of the kickback scheme with Technodyne. Finally, the 8–K explained that Mayor Bloomberg had

> indicated that the City intends to pursue the recovery of costs associated with the CityTime program that the City's investigation reveals were improperly charged to the City. The City has not filed any claim against the Company or otherwise requested reimbursement or return of payments previously made to the Company and the Company has not recorded any liabilities relating to this contract other than the approximately $2.5 million it offered to refund. However, there is a reasonable possibility of additional exposure to loss that is not currently estimable if there is an adverse outcome. An adverse outcome of any of these investigations may result in non-payment of amounts owed to the Company, a demand for reimbursement of other amounts previously received by the Company under the contract, claims for additional damages, and/or fines and penalties, which could have a material adverse effect on the Company's consolidated financial position, results of operations and cash flows.

Joint App'x 254–55.

In addition to filing the 8–K on June 2, 2011, SAIC held a conference call with analysts and investors to discuss SAIC's earnings. During the call, Havenstein referred investors to the 8–K for detailed information about the CityTime project and the ongoing criminal investigation. Similarly, on June 3, 2011, SAIC filed a Form 10–Q that repeated the representations made in the 8–K about the project.

On July 1, 2011, SAIC filed a second 8–K that included a letter from Mayor Bloomberg formally demanding that SAIC reimburse the City in the approximate amount of $600 million. On August 31, 2011, SAIC issued a press release announcing losses for the fiscal period ending July 31, 2011, due in part to the winding down of the CityTime contract and "probable" restitution to the City for wrongful conduct. Joint App'x 260. From June 2, 2011, when SAIC first disclosed the existence of a criminal investigation and the possible magnitude of its reimbursement to the City, to September 1, 2011, the day after it announced the termination of the CityTime contract, SAIC's stock price fell from $17.21 to $12.97 per share.

In March 2012 SAIC entered into a deferred prosecution agreement with the Government and the DOI, pursuant to which SAIC agreed to reimburse the City approximately $500.4 million and to forfeit $40 million in unpaid receivables. SAIC also agreed to cooperate with the Government's investigation of the CityTime fraud and to issue a "Statement of Responsibility" in which it acknowledged that it had defrauded the City through its managerial employees. SAIC admitted, among other things, that it should have supervised Denault's activities, controlled the cost of the project, addressed concerns about its relationship with Technodyne, and properly investigated an early anonymous internal complaint about Denault's relationship with Technodyne on the project.

## 2. *Procedural History*

Plaintiffs filed this lawsuit against SAIC and the individual defendants under Section 10(b) and Section 20(a) of the Exchange Act. As relevant here, they claimed that SAIC's March and June 2011 SEC filings on Forms 10–K, 10–Q, and 8–K failed to disclose SAIC's potential liability arising out of the CityTime fraud or known trends or uncertainties associated with the fraud, as required by FAS 5 and Item 303. Plaintiffs also claimed that the March 2011 Form 10–K contained misstatements regarding the efficacy of SAIC's internal controls, that SAIC's 2011 Annual Report contained misleading statements regarding SAIC's commitment to ethics and integrity, and that in its June 2011 conference call, SAIC misrepresented its potential liability for the CityTime project.

By order dated September 30, 2013 (the "September 2013 Order"), the District Court denied Defendants' motions to dismiss Plaintiffs' claims alleging violations of FAS 5 and Item 303 on the March 2011 Form 10–K, but granted Defendants' motions to dismiss with respect to most of Plaintiffs' other claims for failure to state a claim. *In re SAIC, Inc. Sec. Litig. (SAIC I)*, No. 12–CV–1353 (DAB), 2013 WL 5462289, at *16 (S.D.N.Y. Sept. 30, 2013). It granted Plaintiffs leave to amend, within forty-five days, a subset of the dismissed claims, specifically (1) the internal control claim based on the March 2011 Form 10–K and (2) the claims against all of the individual defendants except Denault. *Id.* at *17. Plaintiffs elected to forgo amending their complaint to replead those claims within the forty-five-day window, deciding instead to proceed with the surviving FAS 5 and Item 303 claims relating to SAIC's March 2011 Form 10–K.

SAIC, by contrast, moved the District Court to reconsider its decision not to dismiss Plaintiffs' FAS 5 and Item 303 claims based on the March 2011 Form 10–K. On January 30, 2014, the District Court granted SAIC's motion and immediately entered judgment dismissing Plaintiffs' remaining claims with prejudice (the "January 2014 Order"). *In re SAIC, Inc. Sec. Litig. (SAIC II)*, No. 12–CV–1353 (DAB), 2014 WL 407050, at *1 (S.D.N.Y. Jan. 30, 2014).

On March 4, 2014, Plaintiffs moved to vacate or to obtain relief from the judgment pursuant to Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure and moved under Rule 15(a) for leave to file a proposed amended complaint in the form of the PSAC. As relevant here, the PSAC alleged the following additional facts: (1) SAIC was aware of the Government's criminal investigation of Denault by the end of December 2010 and had agreed to advance Denault's legal fees in connection with the investigation and any criminal proceeding that emerged; (2) the December 2010 criminal complaint suggested that SAIC had engaged in improper conduct; (3) by December 19, 2010, SAIC had initiated an internal investigation of Denault's timekeeping practices; (4) Mayor Bloomberg announced in a press release (December 16, 2010) and in a *Daily News* article (December 20, 2010) that he was reevaluating SAIC's role in the CityTime project and reviewing all payments the City made with a goal of recovering funds from SAIC; (5) SAIC removed Denault from the CityTime project and placed him on administrative leave on December 21, 2010; (6) the New York State Comptroller's Office and the City Mayor's Office each rejected contract awards to SAIC in December 2010 based partly on the brewing controversy surrounding the CityTime project; (7) SAIC interviewed Bell about the fraud allegations on January 24, 2011, the day Bell resigned from SAIC; (8) on February 10, 2011, the Government and

the DOI announced the filing of an indictment in connection with a fraud scheme involving CityTime; (9) Bell was subpoenaed concerning CityTime, and SAIC agreed to advance his legal fees in connection with the criminal matter on February 11, 2011; and (10) SAIC's audit team issued a memorandum regarding Denault's improper timekeeping practices on March 9, 2011.

On September 30, 2014, the District Court denied Plaintiffs' motions for relief from judgment, concluding that any amendment as reflected in the PSAC would be futile.[4] *In re SAIC, Inc. Sec. Litig. (SAIC III),* No. 12–CV–1353 (DAB), 2014 WL 4953614, at *4 (S.D.N.Y. Sept. 30, 2014).

This appeal followed.

### DISCUSSION

■ "[A] party seeking to file an amended complaint postjudgment must first have the judgment vacated or set aside pursuant to Rules 59(e) or 60(b)."[5] *Williams v. Citigroup Inc.,* 659 F.3d 208, 213 (2d Cir.2011). Rule 60(b)(6) authorizes a court to grant relief from a final judgment for "any ... reason that justifies relief." Fed.R.Civ.P. 60(b)(6). We have explained that "in view of the provision in [R]ule 15(a) that leave to amend shall be freely given when justice so requires, it might be appropriate in a proper case to take into account the nature of the proposed amendment in deciding whether to vacate the previously entered judgment." *Williams,* 659 F.3d at 213 (quotation marks omitted).

■ Here, the District Court denied leave to amend under Rule 60(b)(6) solely on the ground that amendment (in the form of the PSAC) would be futile,[6] a determination that we review *de novo. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,* 752 F.3d 173, 188 (2d Cir.2014). We assess futility as we would a motion to dismiss, determining whether the proposed complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In this case, because the PSAC alleges securities fraud, it must also satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b)(1)–(2), and Rule 9(b) of the Federal Rules of Civil Procedure. *ECA, Local 134 IBEW Joint Pension Tr.*

4. The District Court also rejected Plaintiffs' arguments that the judgment should be set aside because of the discovery of new evidence adduced in Denault's criminal trial. Because we conclude that the District Court erred in not granting leave to amend, we do not reach this issue.

5. The District Court analyzed Plaintiffs' motion under Rule 60(b) only, explaining in a footnote that their Rule 59(e) motion was untimely because it "was filed 32 days after entry of Judgment." *SAIC III,* 2014 WL 4953614, at *2 n. 5. As an initial matter, the District Court was mistaken when it held that Plaintiffs' Rule 59(e) motion was untimely. Although the judgment was signed on January 31, 2014, it was not entered on the docket until February 4, 2014. Plaintiffs filed their motion 28 days later, on March 4, 2014, and their request to amend the judgment under Rule 59(e) was therefore timely. *See* Fed. R.Civ.P. 59(e) ("A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment.").

6. Plaintiffs also argue that the District Court erred by dismissing the remaining claims in its January 2014 Order and closing the case without granting Plaintiffs leave to replead *sua sponte.* We have described a similar argument in another case as frivolous, *see Williams,* 659 F.3d at 212, and, accordingly, we conclude that the District Court did not abuse its discretion in refusing to grant leave to replead *sua sponte.*

*of Chi. v. JP Morgan Chase Co.,* 553 F.3d 187, 196 (2d Cir.2009). The PSAC therefore must allege with particularity facts that give rise to "a strong inference" that SAIC acted consciously and recklessly in omitting or misrepresenting financial information. *Id.* at 198.

On appeal, Plaintiffs elected to substantially shorten the class period and affirmatively waived any challenge to the District Court's dismissal of claims arising out of alleged false statements, omissions, or other violations of the securities laws that occurred prior to March 2011. *See* Oral Argument Tr. at 4. We therefore affirm the District Court's dismissal of those claims, and in the remainder of this opinion we focus only on claims arising from misstatements and omissions during the shorter class period from March 23, 2011 to September 1, 2011.

### 1. *Plaintiffs' FAS 5 Claim Based on the March 2011 Form 10–K*

▮ To succeed on a claim under Section 10(b) of the Exchange Act and Rule 10b–5, "a plaintiff must allege that [each] defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 105 (2d Cir.2007). And while "[f]inancial statements ... which are not prepared in accordance with [GAAP are] presum[ptively] ... misleading or inaccurate," 17 C.F.R. § 210.4–01(a)(1), "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.2000). "Only where such allegations are coupled with evidence of corre-

sponding fraudulent intent might they be sufficient." *Id.* (quotation marks omitted).

Plaintiffs allege that SAIC violated GAAP by failing to comply with FAS 5, which requires the issuer to disclose a loss contingency when a loss is a "reasonable possibility," meaning that it is "more than remote but less than likely." Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 5, Accounting for Contingencies ¶¶ 3, 10 (1975) (hereinafter FAS Board, Statement of FAS 5). Here, Plaintiffs assert that SAIC failed to disclose the loss contingency related to the CityTime fraud in SAIC's March 2011 Form 10–K.

At the outset, we note that the District Court appears to have misunderstood the standard applicable to claims under FAS 5 when it held that FAS 5 does not require disclosure "unless it is considered *probable* that a claim will be asserted." *SAIC II,* 2014 WL 407050, at *3 (emphasis added) (quotation marks omitted). The "probability" standard applies in lieu of the "reasonable possibility" standard only if the loss contingency arises from "an unasserted claim or assessment when there has been *no* manifestation by a potential claimant of an awareness of a possible claim or assessment." FAS Board, Statement of FAS 5 ¶ 10 (emphasis added). But in this case, the "reasonable possibility" standard applies in view of the PSAC's allegation that by March 2011 the City *had* manifested an awareness of a possible, sizeable claim against SAIC. With that standard in mind, we turn to the allegations in the PSAC relevant to the March 2011 Form 10–K.

By the time SAIC filed that 10–K, the PSAC alleges, the CityTime criminal investigation was as focused on SAIC as it was on SAIC's individual employees; the December 2010 criminal complaint against individuals involved in the CityTime project alluded to SAIC's improper actions;

Denault had been interviewed by prosecutors, and both SAIC and Denault received a grand jury subpoena for the production of documents related to the CityTime project; Mayor Bloomberg announced a re-evaluation of SAIC's role in the CityTime project, including a full review of all payments the City had made to SAIC; and SAIC agreed to pay Denault's and Bell's legal fees associated with any criminal proceedings. Moreover, the PSAC alleged that by March 9, 2011, when SAIC received the results of its internal investigation about possible fraud, SAIC was aware not only of Denault's wrongdoing but also its own potential liability to the City.

■ For these reasons we hold that the PSAC adequately alleged that SAIC violated FAS 5 by failing to disclose a loss contingency in its March 2011 10–K arising from the City's manifest awareness of a possible material claim against SAIC.

2. *Plaintiffs' Item 303 Claim Based on the March 2011 Form 10–K*

We next consider whether the PSAC adequately pleaded a violation of Item 303, which imposes specific "disclosure requirements on companies filing" reports on SEC Forms 10–K and 10–Q. *Stratte–McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir.2015). As relevant here, Item 303 requires that SAIC's 10–K "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).[7] According to the SEC's interpretive release

regarding Item 303, "disclosure [under Item 303] is necessary 'where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations.'" *Stratte–McClure*, 776 F.3d at 101 (quoting Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989) (hereinafter SEC's Interpretive Release)).

The PSAC alleges that SAIC violated Item 303 by failing to disclose: "(i) that SAIC had overbilled [the City] hundreds of millions of dollars on CityTime over a multi-year period; and (ii) that SAIC's overbilling practices subjected it to numerous undisclosed risks, including monetary risks and reputational risks, particularly because government agencies are SAIC's primary customers and any harm to its reputation and/or relationships with such agencies would adversely affect its current business, as well as its future revenues and growth prospects." Joint App'x 230.

SAIC makes two principal arguments in defense of the District Court's conclusion that Plaintiffs' Item 303 claim was inadequately pleaded. First, it argues that it must actually have known of the relevant uncertainty at the time of the March 2011 filing, but that Plaintiffs failed to plead that SAIC actually knew then about the scheme. Second, it insists that the loss of the CityTime contract was not material to SAIC's operations as a whole.

---

7. In *Stratte–McClure*, we held that Item 303 imposes an "affirmative duty to disclose ... [that] can serve as the basis for a securities fraud claim under Section 10(b)." 776 F.3d at 101. We explained that "failure to comply with Item 303 ... *can* give rise to liability under Rule 10b–5 so long as the omission is *material* under *Basic [Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ], and the other elements of Rule 10b–5 have been established." *Stratte–McClure*, 776 F.3d at 103–04 (emphases added).

We have never directly addressed whether Item 303 requires that a company actually know or merely should have known of the relevant trend, event, or uncertainty in order to be liable for failing to disclose it. Instead, we appear to have assumed, without deciding, that Item 303 required an allegation or showing of actual knowledge rather than a lesser standard of recklessness or negligence. In *Panther Partners*, for example, we held that the complaint adequately alleged that defects in the defendant corporation's semiconductor chips "constituted a known trend or uncertainty that [the defendant] reasonably expected would have a material unfavorable impact on revenues or income." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 121 (2d Cir.2012). We did not separately consider whether the defendant actually had to know about the existing financial uncertainty associated with the defect. *Id.; see also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir.2011) (concluding that, where it was undisputed that "the downward trend in the real estate market was already known and existing at the time of the [initial public offering], ... the sole remaining issue [was] whether the effect of the 'known' information was 'reasonably likely' to be material").

■ The plain language of Item 303 confirms our previous assumption that it requires the registrant's actual knowledge of the relevant trend or uncertainty. Item 303 demands that the registrant "[d]escribe any *known* trends or uncertainties" and also requires disclosure where "*the registrant knows of* events that will cause a material change in the relationship between costs and revenues," such as a "*known* future increase[ ] in costs of labor." 17 C.F.R. § 229.303(a)(3)(ii) (emphases added). The SEC's interpretation of Item 303 further confirms this plain-language reading of Item 303, insofar as it advises that the trends or uncertainties must be "presently *known to management.*" SEC's Interpretive Release (emphasis added). We therefore hold that Item 303 requires the registrant to disclose only those trends, events, or uncertainties that it actually knows of when it files the relevant report with the SEC. It is not enough that it should have known of the existing trend, event, or uncertainty.

■ Here, the PSAC's allegations support a strong inference that SAIC actually knew (1) about the CityTime fraud before filing its Form 10–K on March 25, 2011, and (2) that it could be implicated in the fraud and required to repay the City the revenue generated by the CityTime contract.[8] Moreover, the PSAC plausibly alleges that, in December 2010, as a result of the CityTime fraud, both the City and New York State rejected pending contract awards to SAIC valued at more than $150 million. Exposure of the fraud also jeopardized SAIC's existing or future relationships with other governmental entities that accounted for a significant amount of its revenue. *See Panther Partners Inc.*, 681 F.3d at 121. Indeed, the PSAC alleges, SAIC anticipated that the potential sale of CityTime's timekeeping software to other municipalities presented a "market opportunity valued [internally] at approximately $2 billion." Joint App'x 134. SAIC was aware of the fraud by late March 2011 but

---

8. This was not an "uncertainty" arising out of a run-of-the-mill civil enforcement investigation by the SEC. *See In re Lions Gate Entm't Corp. Sec. Litig.*, No. 14–CV–5197 (JGK), 2016 WL 297722, at *14 (S.D.N.Y. Jan. 22, 2016). Rather, as alleged in the PSAC, by early March 2011 SAIC was aware that it faced serious, ongoing criminal and civil investigations that exposed it to potential criminal and civil liability and that ultimately did result in criminal charges and substantial liability.

was uncertain about its likely effect on SAIC's current and future revenues. Under those alleged circumstances, SAIC was required under Item 303 to "disclose the manner in which th[at] then-known trend[ ], event[ ], or uncertaint[y] might reasonably be expected to materially impact" SAIC's future revenues. *Litwin,* 634 F.3d at 719.

█ We next consider SAIC's argument that the loss of the CityTime contract was ultimately not material in view of the fact that it was a single contract out of SAIC's more than 10,000 ongoing contracts and that it was worth a fraction of SAIC's yearly revenues ($635 million compared to $10 billion). We reject SAIC's materiality argument, which asks us to consider quantitative factors only in the narrowest light in determining the financial impact of losing the CityTime project due to the fraud, and to otherwise ignore qualitative factors. *See id.* at 717–18.

When a district court is in effect faced with a motion to dismiss a complaint, we have cautioned that "[b]ecause materiality is a mixed question of law and fact, in the context of a [Rule] 12(b)(6) motion, '[the] complaint may not properly be dismissed ...' on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *ECA,* 553 F.3d at 197 (quoting *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 162 (2d Cir.2000)). Here, as we have just observed, the PSAC alleges that SAIC anticipated that the potential sale of CityTime's timekeeping software to other municipalities presented a "market opportunity valued [internally] at approximately $2 billion"—twenty percent of its yearly revenue. The PSAC also points to SAIC's possible exposure to significant civil and even criminal liability arising from the sub-

mission of fraudulent time and billing records to the City and the resulting risk of loss of revenue from future contracts for CityTime projects or debarment from other government contracts altogether. The seriousness of the CityTime fraud and the alleged importance of the CityTime project to SAIC's future presence in the City and its ability to sell similar services to other municipalities around the United States makes us reluctant to conclude at this stage that the alleged misstatements were "so obviously unimportant" either quantitatively or qualitatively that they could not be material.

### 3. Scienter

█ Next, we consider whether the plaintiffs have plausibly alleged that SAIC acted with the requisite scienter when it violated FAS 5 and Item 303 in connection with its March 2011 Form 10–K. In other words, does the PSAC allege "facts to show ... strong circumstantial evidence of conscious misbehavior or recklessness" on SAIC's part? *ECA,* 553 F.3d at 198. It does. If credited, the allegations in the PSAC strongly suggest that by March 9, 2011, when SAIC received the results of its internal investigation but before it filed its 10–K, SAIC knew about Denault's kickback scheme, the extent of the CityTime fraud, and, as we have already explained, that it risked civil and criminal fines and penalties, let alone losing a significant number of current and future government contracts. We conclude that the allegations support the inference that SAIC acted with at least a reckless disregard of a known or obvious duty to disclose when, as alleged, it omitted this material information from its March 2011 10–K in violation of FAS 5 and Item 303.

SAIC responds that it is simply implausible that it (or, for that matter, any of the defendants) would deliberately conceal the

"misconduct of rogue employees for just over two months, from the filing of the 10–K on March 25 until [SAIC's] disclosures on June 2, 2011," because the benefits of a brief concealment would be low. Appellee's Br. 53. But this "argument confuses expected with realized benefits." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir.2008). For it is "cogent and at least as compelling as any opposing inference of nonfraudulent intent," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007), to infer that at the time it filed its 10–K in March 2011, SAIC believed it had more time before prosecutors would reveal its role in the scheme and before the City formally requested reimbursement; and if SAIC believed that it had more time, then "the benefits of concealment might [have] exceed[ed] the costs" as of March 2011. *Tellabs*, 513 F.3d at 710. In fact, at that time, it was unclear when and to what degree SAIC's role in the fraud would be made public. The PSAC's theory, then—that the Government and the City uncovered SAIC's role in the fraud sooner than SAIC expected and compelled an earlier-than-expected disclosure in June 2011—is hardly implausible.

In sum, we disagree with the District Court's conclusion that amending the complaint to include the FAS 5 and Item 303 claims based on the March 2011 10–K would be futile.

### 4. *Plaintiffs' Remaining Claims*

We briefly address Plaintiffs' remaining claims on appeal.

First, the District Court dismissed with prejudice the FAS 5 claim based on SAIC's June 2011 Form 8–K and then refused to grant leave to amend the claim in the PSAC. *See SAIC I*, 2013 WL 5462289, at *10–11; *SAIC III*, 2014 WL 4953614, at *4. We agree with the District Court that amendment of this claim would be futile, notwithstanding the new facts alleged in the PSAC. SAIC's June 2011 Form 8–K adequately disclosed the total amount that SAIC billed the City under the CityTime project; the $40 million in outstanding receivables, Denault's arrest for fraud, SAIC's subsequent $2.5 million reimbursement offer to the City, and the "reasonable possibility" of additional exposure to loss from "a demand for reimbursement of other amounts." Joint App'x 254–55. Plaintiffs failed to identify in their complaint any additional disclosures SAIC should have made in the 8–K to more accurately portray the extent of SAIC's exposure to liability from the project.

Second, Plaintiffs challenge the District Court's dismissal of their claims that SAIC's 2011 Annual Report contained materially false statements about SAIC's commitment to ethics and integrity. In particular, the PSAC points to representations in the Annual Report regarding SAIC's "culture of high ethical standards, integrity, operational excellence, and customer satisfaction" and its "reputation for upholding the highest standards of personal integrity and business conduct." Joint App'x 252. We affirm the District Court's dismissal of the claims based on these representations for substantially the reasons provided by the District Court. *See SAIC I*, 2013 WL 5462289, at *13. On appeal, Plaintiffs argue that these general statements, while typically not actionable, are actionable in this context because Defendants were aware of facts undermining the positive statements about SAIC's commitment to ethics and integrity. But "Plaintiffs' claim that these statements were knowingly and verifiably false when made does not cure their generality, which is what prevents them from rising to the

level of materiality required to form the basis for assessing a potential investment." *City of Pontiac Policemen's & Firemen's Ret. Sys.*, 752 F.3d at 183; *see also ECA*, 553 F.3d at 206 ("No investor would take such statements seriously in assessing a potential investment, for the simple fact that almost every investment bank makes these statements."). We cannot distinguish the statements in the Annual Report from the statements at issue in *ECA*, for example, in which we referred to representations in an SEC filing about a bank's reputation for integrity as "no more than 'puffery' which does not give rise to securities violations," and suggested that such statements are typically "too general to cause a reasonable investor to rely upon them," in part because an investor "would not depend on [the statements] as a guarantee that [the company] would never take a step that might adversely affect its reputation." *ECA*, 553 F.3d at 206. This is not to say that statements about a company's reputation for integrity or ethical conduct can never give rise to a securities violation. Some statements, in context, may amount to more than "puffery" and may in some circumstances violate the securities laws: for example, a company's specific statements that emphasize its reputation for integrity or ethical conduct as central to its financial condition or that are clearly designed to distinguish the company from other specified companies in the same industry.

Finally, we affirm the District Court's dismissal of Plaintiffs' internal control claim based on the March 2011 Form 10–K and their claims against Sopp and Havenstein. In initially dismissing these claims without prejudice in its September 2013

Order, the District Court granted Plaintiffs an opportunity to amend their complaint within forty-five days, but Plaintiffs, without explanation, failed to do so. Under the circumstances, Plaintiffs' failure to comply with the District Court's reasonable schedule was a legitimate reason to dismiss those claims with prejudice.[9]

## CONCLUSION

For the foregoing reasons, we **VACATE** the judgment of the District Court with respect to Plaintiffs' FAS 5 and Item 303 claims based on SAIC's March 2011 Form 10–K and **REMAND** for further proceedings consistent with this opinion. We **AFFIRM** the judgment of District Court with respect to Plaintiffs' other claims.

---

9. Because Plaintiffs have made no specific arguments with respect to the District Court's dismissal of their claims against the individual defendants, we alternatively affirm the dismissal of these claims on the ground that they have been abandoned. *See Norton v. Sam's Club*, 145 F.3d 114, 117–18 (2d Cir.1998).