McMahon, C.J.:
Defendants Signet Jewelers Limited ("Signet") and certain of its senior executives (collectively, the "Defendants") move for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), asking the Court to dismiss all securities fraud allegations against them based upon statements contained in Signet's code of conduct. (Dkt. No. 149.) The gravamen of their motion is that the Second Circuit's recent decision in Singh v. Cigna Corp. , 918 F.3d 57 (2d Cir. 2019) requires the Court to, in effect, revisit its recent decision denying Defendants' motion to dismiss.
Defendants' motion is denied.
I. Factual and Procedural Background
The Court presumes the parties' familiarity with the facts of this case, which were detailed in the Court's November 26, 2018 Decision and Order Denying Defendants'
*224 Motion to Dismiss the Fifth Amended Class Action Complaint. (See Dkt. No. 120.) See also In re Signet Jewelers Ltd. Sec. Litig. , No. 16 CIV. 6728 (CM), 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018). As set forth in that opinion, Lead Plaintiff the Public Employees' Retirement System of Mississippi (hereinafter referred to as the "Plaintiff") alleges that Defendants committed securities fraud in two distinct forms: by misrepresenting (i ) the health of Signet's credit portfolio and (ii ) the company's alleged "pervasive" culture of sexual harassment. (Fifth Amended Complaint ("FAC") ¶ 300, dated Mar. 22, 2018, Dkt. No. 111.) Defendants' present motion implicates the second category of fraudulent misstatements. Thus, the Court will re-summarize Plaintiff's allegations, but only as to that second category, for purposes of addressing the instant motion.
a. Signet's Corporate Culture
On March 18, 2008, a class of current and former female Signet employees filed a putative class action in this District, alleging that employees of a wholly owned subsidiary of Signet, Sterling Jewelers, Inc. ("Sterling"), were subjected to gender discrimination through improper promotion and compensation practices, in violation of Title VII and the Equal Pay Act. See Jock et al. v. Sterling Jewelers, Inc. , No. 08 Civ. 2875 (S.D.N.Y.) (Rakoff, J. ). Pursuant to an arbitration provision in Sterling's employment agreement, the matter was referred to a confidential arbitration (hereinafter referred to as "Jock " or the "Jock Litigation"). (FAC ¶ 179.)
Signet first disclosed the Jock Litigation in a Form 6-K filed with the Securities and Exchange Commission ("SEC") on March 20, 2008, stating that the lawsuit "is based on the allegations of 15 former and current employees working in a few stores.... When these allegations first surfaced, they were investigated. That investigation failed to substantiate the allegations." Signet Jewelers Ltd., Special Report of Foreign Issuer (Form 6-K) (Mar. 20, 2008).
After the United States Equal Employment Opportunities Commission ("EEOC") filed a lawsuit against Sterling on substantially the same basis (FAC ¶ 180), Signet filed another Form 6-K, supplementing its previous public disclosure to include a statement that, "The US Equal Opportunities [sic ] Commission has filed a separate lawsuit alleging that US store-level employment practices are discriminatory as to compensation and promotional activities[,]" Signet Jewelers Ltd., Special Report of Foreign Issuer (Form 6-K), Note 9 (Mar. 25, 2009).
After a request from the SEC to supplement its disclosures with a "brief[ ] descri[ption of] the factual basis alleged to underlie the class action proceedings" (id. ¶ 189), Signet disclosed that Jock was a suit "by private plaintiffs alleging that US store-level employment practices are discriminatory as to compensation and promotional activities[,]" Signet Jewelers Ltd., Annual Report (Form 10-K), at 119 (Mar. 30, 2011). This characterization of the Jock Litigation appears in Signet's SEC filings up to the end of the Class Period. See, e.g. , Signet Jewelers Ltd., Annual Report (Form 10-K), at 122 (Mar. 16, 2017).
As part of the Jock Litigation, the claimants filed for class certification, in which the briefing on that issue included approximately 250 declarations from nearly 200 employees detailing their experiences at Sterling. (Id. ¶¶ 181, 275.) Because the arbitration proceedings were confidential, those declarations were not initially made public; instead, counsel for the plaintiffs in that case posted on its website a version of its class certification brief with Signet-approved redactions. (Id. ¶ 182.) The redacted brief contained limited information from the declarations and, according to Plaintiff, *225 "obscured" the nature of the allegations contained therein. (Id. ¶ 183.)
On November 26, 2013, Signet disclosed that, "In mid-October 2013, Sterling filed its opposition to Claimants' class certification motion, its disclosure of its experts and their reports, as well as three motions to exclude the reports of Claimants' experts and a motion to strike Claimants' declarations and attorney summaries." Signet Jewelers Ltd., Quarterly Report (Form 10-Q) Item 1, Note 13 (Nov. 26, 2013). It did not elaborate on the content of the allegations of contained in those moving papers - including those that were contained in the declarations from Signet's employees. Id.
The declarations were publicly disclosed on February 26, 2017 - albeit still with certain "company-approved redactions." They contain various allegations that sexual harassment, rather than being confined to "store-level employees," was rampant at Signet at all levels, including among senior executives. (Id. ¶¶ 204-205.) Among other allegations, the declarations alleged that the ranks of Signet's executives were filled with "womanizers," "playboy[s]," and serial sexual harassers who made "sexual conquests of female associates." (Id. ¶¶ 206-216.) Sexual harassment allegedly occurred in the ordinary course of business and at the company's annual "Managers' Meetings," which were described as "sexcapades" where male executives "sexually prey[ed]" on female subordinates and engaged in "sexually promiscuous activity" with "subordinate female managers." (Id. ¶¶ 216, 209-16, 218-31, 233-40, 242-52, 255, 257-68, 279, 287, 291-92.) Declarants also alleged that female employees were propositioned to engage in sexual behavior in exchange for employment advancement opportunities; those who accepted were rewarded by way of promotion, and those who declined or reported the activity to an anonymous hotline were retaliated against. (Id. ¶¶ 242-68, 280-82, 284, 292.) Specific allegations of sexual misconduct were even leveled against Signet's then-CEO, Mark Tight, who is a Defendant in this action. (Id. ¶¶ 226-27, 279.)
The day after the declarations were made public, the Washington Post wrote an article detailing their contents. See Drew Harwell, Hundreds Allege Sexual Harassment, Discrimination at Kay and Jared Jewelry Company , Wash. Post (Feb. 27, 2017), https://www.washingtonpost.com/business/economy/hundreds-allege-sex-harassment-discrimination-at-kay-and-jared-jewelry-company/2017/02/27/8dcc9574-f6b7-11e6-bf01-d47f8cf9b643_story.html?utm_term=.e17e37e424de.
The following day, Signet's stock fell 8.3% by midday, prompting Signet to halt trading pending a release of news. (FAC ¶ 281.) Signet then issued a press release in which it characterized "media reports" as presenting a "distorted and inaccurate picture of our company," and amplifying the voices of "a very small number of individuals in a workforce of more than 84,000." Signet Jewelers Ltd., Sterling Jewelers Statement on Ongoing Arbitration (Feb. 28, 2017), https://www.signetjewelers.com/investors/news-releases/news-release-details/2017/Sterling-Jewelers-Statement-on-Ongoing-Arbitration/default.aspx. By close of business that day, Signet's stock had fallen 13%. (FAC ¶¶ 280-82.)
On July 17, 2017, Signet issued a press release announcing that Light was retiring. (Id. ¶ 290.) See also Signet Jewelers Ltd., Signet Jewelers Appoints Virginia "Gina" C. Drosos as CEO (July 17, 2017) https://www.signetjewelers.com/investors/news-releases/news-release-details/2017/Signet-Jewelers-Appoints-Virginia-Gina-C-Drosos-as-CEO/default.aspx. Light's announcement stated, "Given the Company's *226 positive direction and my need to address some health issues, the Board and I agreed that it is a good time for a transition." (Id. )
b. Allegations of Fraud
On March 22, 2018, Plaintiff filed the FAC, the operative complaint in this action, alleging that Defendants were liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder (Count I), as well as Section 20(a) of the Exchange Act (Count II).
Among other things, the FAC alleges that the emergence of the Jock declarations rendered false and misleading Defendants' public statements about Signet's corporate culture and commitment to preventing gender discrimination, because the declarations demonstrate that Signet had a "pervasive culture of sexual harassment." (FAC ¶ 300.)
In support of this allegation, Plaintiff points to statements contained in Signet's Code of Conduct and Code of Ethics (collectively, the "Code"), both of which were re-adopted each year by Signet's board of directors, published on Signet's website (id. ¶ 199), and incorporated by reference into Signet's SEC filings, see, e.g. , Signet Jewelers Ltd., Annual Report (Form 10-K), Item 10 (Mar. 27, 2014); Signet Jewelers Ltd. Annual Report (Form 10-K), Item 10 (Mar. 26, 2015). The Code of Conduct explained that Signet (i ) made employment decisions "solely" on the basis of merit (id. ¶ 330); (ii ) was "committed to a workplace that is free from sexual, racial, or other unlawful harassment" and does not tolerate "[a]busive, harassing, or other offensive conduct ... whether verbal, physical, or visual" (id. ¶ 332); has "[c]onfidential and anonymous mechanisms for reporting concerns" (id. ¶ 334); disciplines "[t]hose who violate the standards in this Code" (id. ); and requires its senior officials to "[e]ngage in and promote honest and ethical conduct" (id. ¶ 336).
In its Form 20-F, filed with the SEC on April 1, 2009, Signet represented that adherence to the Codes, including by senior executives, was of "vital importance:"
In adopting both the Code of Ethics and the Code of Conduct, the Company has recognized the vital importance to the Company of conducting its business subject to high ethical standards and in full compliance with all applicable laws and, even where not required by law, with integrity and honesty.
Signet Jewelers Ltd., Annual Report for Foreign Private Issuer (Form 20-F) Item 16.B (Apr. 1, 2009).
c. The Court's Decision Denying Defendants' Motion to Dismiss
On November 26, 2018, the Court denied Defendants' motion to dismiss the FAC. (Dkt. No. 120.)
As relevant here, the Court rejected Defendants' contention that the representations contained in Signet's Code concerning their policies and procedures against sexual harassment constituted inactionable puffery. (Id. at 34.) The Court recited the well-established law governing the materiality/puffery analysis, including the law set forth in the Second Circuit's decision in ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co. , 553 F.3d 187, 197, 206 (2d Cir. 2009). (Dkt. No. 120 at 34-35, 22.) Based upon these principles, the Court distinguished immaterial statements from those that could be actionable under the securities laws. Relying upon In re Moody's Corp. Sec. Litig. , 599 F. Supp. 2d 493, 508 (S.D.N.Y.), opinion corrected on denial of reconsideration , 612 F. Supp. 2d 397 (S.D.N.Y. 2009), the Court explained, "While generalized, open-ended or aspirational statements do not give rise *227 to securities fraud (as mere puffery), statements contained in a code of conduct are actionable where they are directly at odds with the conduct alleged in a complaint."
Analogizing the present case to Moody's , 599 F. Supp. 2d at 508-09, the Court concluded that Signet's Code statements - in which it touted how the company makes decisions solely based on merit, disciplines misconduct, and provides a safe and anonymous means for employees to report misconduct without a risk of retaliation - "are directly contravened by allegations in the FAC that the company conditioned employment decisions on whether female employees acceded to sexual demands and retaliated against women who attempted to anonymously report sexual harassment." (Id. at 34-35 (internal citations omitted).)
The Court did, however, conclude that certain other alleged misstatements identified by Plaintiff were too generalized and aspirational to be actionable. (Id. at 35.) Specifically, the Court dismissed Signet's Code statements touting the importance of Signet's relationship with its employees and consumer trust in the Signet brand (FAC ¶¶ 326, 328), because those were "the sort of broad, aspirational, and vague puffery statements that no reasonable investor could possibly consider significant in making investment decisions." (Dkt. No. 120 at 35.)
d. Cigna and Defendants' Present Motion
On March 5, 2019, the Second Circuit issued Singh v. Cigna Corp. , 918 F.3d 57, 63 (2d Cir. 2019).
In Cigna , investors of Cigna Corporation ("Cigna") filed a putative securities fraud class action after the company disclosed that the Centers for Medicare and Medicaid Services ("CMS") audited the company and determined that it had not complied with certain CMS requirements. Of the three groups of statements that were allegedly false and misleading, the plaintiffs asserted that certain representations contained in a company "pamphlet," titled "Code of Ethics and Principles of Conduct," falsely touted the company's commitment to "compliance and integrity." Id. at 61. In light of the revelation of the CMS audit, the plaintiffs specifically claimed that the following two representations were actionable as securities fraud:
(i) " '[I]t's so important for every employee ... to handle, maintain, and report on [Cigna's financial] information in compliance with all laws and regulations;' " and
(ii) " '[W]e have a responsibility to act with integrity in all we do, including any and all dealings with government officials.' "
Id. (quoting pamphlet) (brackets omitted).
Cigna moved to dismiss the complaint, the district court granted that motion, and the plaintiffs appealed.
The Second Circuit affirmed. It concluded that Cigna's purported fraudulent statements were immaterial, because a "reasonable investor would not 'consider [these statements] important in deciding whether to buy or sell shares of stock." Id. at 63 (quoting Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC , 595 F.3d 86, 92-93 (2d Cir. 2010) ). With respect to Cigna's code of ethics, the Second Circuit explained:
Like the District Court, we think that the statements in Cigna's Code of Ethics are a textbook example of "puffery." We have observed that "general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them." The Code of Ethics statements, which amount to general *228 declarations about the importance of acting lawfully and with integrity, fall squarely within this category.
Id. (quoting City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG , 752 F.3d 173, 183 (2d Cir. 2014) (internal quotation marks omitted)).
As night follows day, Defendants filed the present motion, pursuant to Fed. R. Civ. P. 12(c), seeking judgment on the pleadings with respect to Plaintiff's allegations concerning Signet's Code statements. They argue that, under Cigna , the portions of Plaintiff's 10b-5 claim that depend upon Signet's Code statements are likewise immaterial and that, accordingly, the Court must revisit its earlier decision denying Defendants' motion to dismiss under Rule 12(b)(6) and dismiss those allegations.
II. Discussion
Dismissal under Rule 12(c) " 'is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings.' " Virgin Grp. Holdings Ltd. v. Energy Parametrics & Commc'ns, Inc. , No. 10 Civ. 08752 (BSJ) (THK), 2011 WL 4448943, at *1 (S.D.N.Y. Sept. 26, 2011) (quoting Sellers v. M.C. Floor Crafters, Inc. , 842 F.2d 639, 642 (2d Cir. 1988) ). The standard for assessing a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion to dismiss the complaint for failure to state a claim upon which relief can be granted. Ziemba v. Wezner , 366 F.3d 161, 163 (2d Cir. 2004) (citations omitted). To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp v. Twombly , 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A well-pleaded complaint requires "more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).
a. The Motion for Judgment on the Pleadings is Denied
Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b-5, which implements the statute, prohibits making "any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To recover for a violation of Section 10(b) and Rule 10b-5, a private securities plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." City of Westland Police & Fire Ret. Sys. v. MetLife, Inc. , 129 F. Supp. 3d 48, 65 (S.D.N.Y. 2015) (quoting Halliburton Co. v. Erica P. John Fund, Inc. , 573 U.S. 258, 134 S. Ct. 2398, 2407, 189 L.Ed.2d 339 (2014) ).
The issue presented by Defendants' present motion is whether Signet's Code statements constitute inactionable puffery and are therefore immaterial as a matter of law.
"An alleged misrepresentation is material if there is a substantial likelihood that a reasonable person would consider it important whether to buy or sell shares of stock." Cigna , 918 F.3d at 63 (internal quotation marks and citation omitted); accord *229 TSC Indus., Inc. v. Northway, Inc. , 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). A statement is not material unless, in view of a reasonable investor, it has "significantly altered the 'total mix' of information made available." Cigna , 918 F.3d at 63 (internal quotation marks and citation omitted); accord Basic v. Levinson , 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). "The statement must also be 'misleading,' evaluated not only by 'literal truth,' but by context and manner of presentation." Cigna , 918 F.3d at 63 (quoting Operating Local 649 , 595 F.3d at 92 ) (brackets omitted). Where, as here, the materiality of a given statement is at issue, statements may not be dismissed on materiality grounds " 'unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.' " Litwin v. Blackstone Grp., L.P. , 634 F.3d 706, 717 (2d Cir. 2011) (quoting Ganino v. Citizens Utilities Co. , 228 F.3d 154, 162 (2d Cir. 2000) ).
Certain statements are immaterial as a matter of law. "Puffery" is one such type. The Second Circuit defines puffery as statements that are " 'too general to cause a reasonable investor to rely upon them.' " City of Pontiac , 752 F.3d at 183 (quoting ECA, Local 134 , 553 F.3d at 206 ). Archetypal examples of puffery include "statements [that] are explicitly aspirational," City of Pontiac , 752 F.3d at 183, "general statements about reputation, integrity, and compliance with ethical norms," id. , "mere[ ] generalizations regarding [a company's] business practices," ECA, Local 134 , 553 F.3d at 187, and generalized expressions of "optimis[m]," San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc. , 75 F.3d 801, 811 (2d Cir. 1996). As with the general standard governing materiality, determining whether certain statements constitute puffery entails looking at "context," including the "specific[ity]" of the statements and whether the statements are "clearly designed to distinguish the company" to the investing public in some meaningful way. Indiana Pub. Ret. Sys. v. SAIC, Inc. , 818 F.3d 85, 98 (2d Cir. 2016).
Defendants argue, in effect, that Cigna wrought a sea change in the doctrine of puffery. According to Defendants, Cigna "clarified that code statements are non-actionable because they are 'too general to cause a reasonable investor to rely upon them.' " (Defs.' Mem. of Law in Supp. Mot. J. Pleadings ("Defs.' Br.") at 6, dated May 9, 2019, Dkt. No. 150.) In so arguing, they claim that any puffery analysis must be limited to looking at the "nature of the [offending] statements themselves" (id. at 1), without considering whether the "conduct at the company ... contravene[s]" the company's other public disclosures (id. at 6). That other conduct, they submit, is now "irrelevant" (id. ), so the Court's must revisit its earlier conclusion that Plaintiff adequately pleaded that Signet's Code statements were materially false and misleading (see Dkt. No. 120 at 34-35).
Defendants are wrong - both about the law and about the facts of Cigna .
Cigna did not purport to change the well-established law regarding materiality. It did not announce a new legal rule, let alone one deeming an entire category of statements - those contained in a company's code of conduct - per se inactionable. Instead, Cigna simply restated the general rule in the Second Circuit regarding puffery: " 'general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them.' " 918 F.3d at 63 (quoting City of Pontiac , 752 F.3d at 183 ). "[G]eneral declarations about the importance of acting lawfully *230 and with integrity[ ] fall squarely in this category." Id.
Significantly, Cigna did not rule (as Defendants imply) that all statements in codes of conduct qualify as "puffery." Rather, the Cigna court expressly stated that " 'context' " bears on materiality. Id. (quoting Operating Local 649 , 595 F.3d at 92 ). Defendants' interpretation of Cigna asks this Court to do the opposite: ignore all context; just look at the statements in a vacuum; do not consider whether they comport (or contradict) the company's other disclosures and conduct.
Where a statement is located is one factor (of several) relevant to materiality; that was the law before Cigna , and it remains the law after it. But it does not follow from Cigna that a securities fraud claim can never rest on statements contained in a public company's code of conduct. Materiality depends upon a number of context-specific factors, including specificity, emphasis, and whether certain statements are designed to distinguish the company in some fashion that is meaningful to the investing public. See, e.g. , Indiana Pub. Ret. Sys. , 818 F.3d at 98.
Indiana Public Retirement System , a case on which Defendants heavily rely in their moving papers, is instructive. There, shareholders brought a securities fraud action against SAIC, Inc. after it uncovered, and then disclosed the existence of, an elaborate kickback scheme involving a former employee. In light of the newly-revealed kickback scheme, the plaintiffs argued that certain representations contained in the company's prior annual report were materially false. The offending statements were as follows:
"[SAIC possesses a] culture of high ethical standards, integrity, operational excellence, and customer satisfaction," [and a] "reputation for upholding the highest standards of personal integrity and business conduct."
818 F.3d at 97 (internal citation omitted).
The Second Circuit held that these particular statements constituted puffery. Id. at 98. It reasoned that the case was analogous to ECA, Local 134 , stating that it "[could not] distinguish the statements in [SAIC's] Annual Report from the statements in ECA ," because both cases involved generalized statements about a company's "reputation for integrity," which no reasonable investor would take " 'as a guarantee that the company would never take a step that might adversely affect its reputation.' " Id. (quoting ECA, Local 134 , 553 F.3d at 206 (alterations omitted)). In so concluding, the court eschewed laying down a bright line rule of the sort Defendants press for here that would categorize all statements located in a company's code of conduct as immaterial "puffery" as a matter of law. See id. at 98. In fact, the Second Circuit declared the opposite:
This is not to say that statements about a company's reputation for integrity or ethical conduct can never give rise to a securities violation. Some statements, in context, may amount to more than "puffery" and may in some circumstances violate the securities laws: for example, a company's specific statements that emphasize its reputation for integrity or ethical conduct as central to its financial condition or that are clearly designed to distinguish the company from other specified companies in the same industry.
Id.
In other words, context matters. Had the Second Circuit said otherwise (whether in Cigna, Indiana Public Retirement System, ECA, Local 134 , or any other case, for that matter), such a conclusion would plainly violate the Supreme Court's seminal *231 decisions in TSC Industries and Basic . Those cases - which hold that materiality turns on what a reasonable investor would consider "important," TSC Indus. , 426 U.S. at 449, 96 S.Ct. 2126, in light of the "total mix of information made available" by the company, Basic , 485 U.S. at 231-32, 108 S.Ct. 978 - prevent this Court from embracing Defendants' position that code statements can never be material as a matter of law.
Which brings us to the alleged facts of this case. They differ starkly from those alleged in Cigna .
Cigna's code of conduct statements were not actionable, because they were exceptionally vague and aspirational. Those statements - again, that " 'it's so important for every employee ... to handle, maintain, and report on [Cigna's financial] information in compliance with all laws and regulations,' " and that "we have a reasonability to act with integrity in all we do' " - were immaterial, because they represented only "general declarations about the importance of acting lawfully and with integrity[.]" 918 F.3d at 61, 63. Animating the court's decision was the fact that plaintiffs had committed the cardinal sin of bringing a securities fraud lawsuit: they sought to convert their generalized grievance over corporate mismanagement into a specific claim for securities fraud. 918 F.3d at 59-60 (rejecting appellant's "creative attempt to recast corporate mismanagement as securities fraud."); accord Santa Fe Indus., Inc. v. Green , 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).
Notwithstanding Defendants' suggestion to the contrary (see Defs.' Br. at 6), that is not what Plaintiff has done in this case. The crux of Plaintiff's securities fraud claim is as such:
In the face of a credible accusation (by way of another lawsuit) that Signet suffered from rampant sexual harassment - including, but not limited to, conditioning subordinate female employees' promotions to their acceding to the sexual demands of their male supervisors (even those who held the highest positions in the company), and retaliating against those who reported this misconduct (FAC ¶¶ 242-68, 280-82, 284, 292) - Defendants sought to reassure the investing public that Signet did not, in fact, have a toxic workplace (id. ¶¶ 177-194). They did so by including representations in their periodic SEC filings that the company expressly "denies the allegations" in Jock. (Id. ¶¶ 324, 350, 371, 387, 401.) They did so by pointing to their corporate policies (which were incorporated in Signet's securities filings) affirming the company's commitment to making hiring decisions solely on the basis of merit, disciplining misconduct in its ranks, and providing employees with a means to report sexual harassment without fear of reprisal. And they did so by emphasizing that Signet's senior executives held themselves to the highest standards of all.
As alleged, a reasonable investor - who otherwise would be concerned about how grave allegations concerning rampant sexual misconduct might affect her investment in Signet - took Defendants at their word.
As alleged, their word was not truthful.
CONCLUSION
Based on the foregoing, Defendants' motion is denied. The Clerk of Court is respectfully directed to close Dkt No. 149.
This constitutes the decision and order of the Court.