20-1643-cv
New England Carpenters Guaranteed Annuity and Pension Funds v. AmTrust Financial Services, Inc.

# United States Court of Appeals
## For the Second Circuit

August Term, 2020

(Argued: June 4, 2021     Decided: August 23, 2023
Amended:   October 31, 2024)

Docket No. 20-1643-cv

_____

NEW ENGLAND CARPENTERS GUARANTEED ANNUITY AND PENSION
FUNDS,

Lead Plaintiff-Appellant,

STANLEY NEWMARK, IRVING LICHTMAN REVOCABLE LIVING TRUST,
JUPITER CAPITAL MANAGEMENT,

Plaintiff-Movant-Appellants,

SHARON ALBANO, Individually and On Behalf of All Others Similarly
Situated,

Consolidated-Plaintiff-Movant-Appellant,

JOHN SACHETTI, Individually and On Behalf of All Others Similarly Situated,

Consolidated-Plaintiff,

JOEL RUBEL, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

DONALD T. DECARLO, SUSAN C. FISCH, ABRAHAM GULKOWITZ,
GEORGE KARFUNKEL, JAY J. MILLER,

Consolidated-Defendants-Appellees,

AMTRUST FINANCIAL SERVICES, INC., BARRY D. ZYSKIND, RONALD E.
PIPOLY, JR., BDO USA, LLP, RBC CAPITAL MARKETS, LLC, UBS SECURITIES
LLC, CITIGROUP GLOBAL MARKETS INC., KEEFE, BRUYETTE & WOODS,
INC., MORGAN STANLEY & CO. LLC,

Defendants-Appellees.

_____

Before:

LOHIER, NARDINI, Circuit Judges, and KOVNER, Judge.[*]

The Appellants, investors in the securities of AmTrust Financial Services, Inc.,
appeal from a judgment of the United States District Court for the Southern
District of New York (Kaplan, J.) dismissing their complaint for failure to state a
claim under Sections 11, 12, and 15 of the Securities Act of 1933 and Section 10(b)
of the Securities Exchange Act of 1934 against AmTrust, various AmTrust
corporate officers and board members, AmTrust's outside auditor, and multiple
underwriters of AmTrust's sale of securities. The District Court determined that
certain public misstatements relating to AmTrust's recognition of revenue
generated by its extended warranty contracts and the expenses associated with
its payment of discretionary employee bonuses were non-actionable statements
of opinion. We conclude that these misstatements of opinions were actionable
under the circumstances alleged in the Appellants' complaint. We further
conclude that the District Court erred in dismissing the Appellants' claims under
Section 10(b) and Rule 10b-5 against AmTrust's outside auditor. We identify no
error in the District Court's dismissal of the Appellants' remaining claims. We

_____

[*] Judge Rachel P. Kovner, of the United States District Court for the Eastern District of
New York, sitting by designation.

therefore **AFFIRM** in substantial part, **VACATE** in part, and **REMAND** the case for further proceedings.

ANDREW S. LOVE (Susan K. Alexander, Robbins Geller Rudman & Dowd LLP, San Francisco, CA; Samuel H. Rudman, David A. Rosenfeld, Mark T. Millkey, William J. Geddish, Avital O. Malina, Robert D. Gerson, Vincent M. Serra, Robbins Geller Rudman & Dowd LLP, Melville, NY; Jeremy A. Lieberman, Pomerantz LLP, New York, NY; Thomas J. McKenna, Gainey McKenna & Egleston, New York, NY; Kim E. Miller, Kahn Swick & Foti, LLC, New York, NY, *on the brief*), Robbins Geller Rudman & Dowd LLP, San Francisco, CA, *for* Plaintiffs-Appellants.

STEVEN M. FARINA (John S. Williams, Matthew J. Greer, *on the brief*), Williams & Connolly LLP, Washington, D.C., *for* Defendants-Appellees AmTrust Financial Services, Inc., Barry D. Zyskind, Ronald E. Pipoly, Jr., Donald T. DeCarlo, Susan C. Fisch, Abraham Gulkowitz, George Karfunkel, and Jay J. Miller.

TIMOTHY E. HOEFFNER (Jason D. Gerstein, Ludwig von Rigal, *on the brief*), McDermott Will & Emery LLP, New York, NY, *for* Defendant-Appellee BDO USA, LLP.

GREGG L. WEINER (Christopher Thomas Brown, Ropes & Gray LLP, New York, NY; William T. Davison, Ropes & Gray LLP, Boston, MA), Ropes & Gray LLP, New York, NY, *for* Defendants-Appellees Morgan Stanley & Co. LLC, Citigroup Global Markets Inc., UBS Securities LLC, RBC Capital Markets, LLC, and Keefe, Bruyette & Woods, Inc.

LOHIER, *Circuit Judge*:

When is a statement of opinion that reflects some subjective judgment nevertheless actionable under the federal securities laws?

On April 4, 2017, AmTrust Financial Services, Inc., one of the country's largest publicly traded property and casualty insurers, restated five years of its financial results to correct what it acknowledged were significant errors in its annual and quarterly reports filed with the Securities and Exchange Commission ("SEC"). Among other things, AmTrust disclosed that it had improperly recognized most of the expected revenue from certain extended warranty contracts at the start rather than over the life of the contracts. AmTrust also reported that it had improperly accounted for certain discretionary employee bonuses by treating the bonuses as expenses in the year they were paid rather than the year they were earned by employees.

AmTrust's restatement spurred the Appellants in this case, all investors in AmTrust securities,[1] to sue AmTrust, its officers (the "Officer Defendants," and, together with AmTrust, the "AmTrust Defendants"), members of its board of

[1] The named plaintiffs are New England Carpenters Guaranteed Annuity and Pension Funds, Stanley Newmark, Irving Lichtman Revocable Living Trust, Jupiter Capital Management, Sharon Albano, John Sachetti, and Joel Rubel.

4

directors (the "Director Defendants"),[2] its former auditor,[3] and certain underwriters of AmTrust securities (the "Underwriter Defendants"),[4] for misstating the company's financial condition and results in violation of Sections 11, 12, and 15 of the Securities Act of 1933 (the "Securities Act"), and Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and the corresponding Rule 10b-5.

The United States District Court for the Southern District of New York (Kaplan, <u>J</u>.) dismissed the third amended complaint (the "Complaint") under Federal Rule of Civil Procedure 12(b)(6), holding that none of the misstatements were actionable under the securities laws. We agree with the District Court's dismissal of the claims relating to most of the misstatements, and we therefore AFFIRM in substantial part. But as we explain below, we disagree with the District Court's dismissal of the Appellants' claims under Sections 11, 12(a)(2),

---

[2] The Officer Defendants are Barry D. Zyskind (at all relevant times AmTrust's President and Chief Executive Officer ("CEO")) and Ronald E. Pipoly Jr. (at all relevant times AmTrust's Executive Vice President and Chief Financial Officer ("CFO")). The Director Defendants are Donald T. DeCarlo, Susan C. Fisch, Abraham Gulkowitz, George Karfunkel, and Jay J. Miller.

[3] BDO USA, LLP ("BDO").

[4] RBC Capital Markets, LLC, UBS Securities LLC, Citigroup Global Markets Inc., Keefe, Bruyette & Woods, Inc., and Morgan Stanley & Co. LLC.

and 15 of the Securities Act against AmTrust, its officers and directors, and the Underwriter Defendants related to AmTrust's accounting for revenue generated by its extended warranty contracts and the expenses associated with discretionary employee bonuses. We also conclude that the District Court should not have dismissed the Appellants' claims under Section 10(b) of the Exchange Act and corresponding Rule 10b-5 against BDO. We therefore VACATE the judgment insofar as it dismisses those claims and REMAND to the District Court for further proceedings consistent with this opinion.

## BACKGROUND

### I. Factual Background

The following facts, which we assume to be true for purposes of this appeal, are drawn from the Complaint and the documents it incorporates by reference. See Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 708 (2d Cir. 2011).

AmTrust provides workers' compensation, commercial automobile insurance, general liability, and extended service and warranty coverage. As relevant to this appeal, AmTrust promotes and markets extended service plans ("ESPs")—essentially extended warranties. AmTrust receives two types of revenue from its ESP business. First, AmTrust and its subsidiaries sell

6

contractual liability insurance to various retailers, covering the obligations that the retailers assume as part of the ESPs. Second, retailers pay AmTrust "for marketing and administrative services," including "call center services," related to the ESPs. Joint App'x 67, 82. During the relevant time, AmTrust "recognize[d] revenue related to promotion, marketing and administration services at the time of the sale of ESP[s]" but "defer[red] a portion of service revenue based upon an estimate of administrative services to be provided in future periods." Joint App'x at 82.

Starting in 2010, AmTrust made a number of acquisitions that fueled much of its corporate growth. The acquisition most relevant to this appeal closed in 2010, when AmTrust bought Warrantech, a publicly traded company focused on providing ESPs and warranty programs for retailers, dealers, distributors, and manufacturers that became, after the acquisition, a core part of AmTrust's business. Prior to the acquisition, the SEC had investigated Warrantech's practice of recognizing the full amount of the revenue it received from its ESPs and other service contracts at the time the contract was entered and the initial sale of services commenced (we will at times refer to this as the "time-of-sale" approach). The SEC had instructed Warrantech instead to recognize the revenue

7

generated by those contracts on a straight-line basis over the life of the contracts. Warrantech publicly announced that it would comply with the SEC's guidance, abandoned its time-of-sale approach, and revised its method of recognizing revenue relating to the ESPs. For reasons that are unclear, AmTrust, though aware of the SEC's prior guidance to the contrary, reverted back to the original time-of-sale approach after it acquired Warrantech.

From 2012 to 2016 the price of AmTrust stock, which traded on the NASDAQ Global Market, skyrocketed. The company's gross written premiums, a central measure of its financial condition, grew from $2.75 billion to $7.95 billion. Yet as early as 2013, financial commentators and analysts began speculating publicly about AmTrust's actual financial condition. One commentator reported that AmTrust may have used accounting gimmicks to inflate its earnings and net equity. A financial journal, Barron's, questioned AmTrust's accounting practices.

The bad press failed to slow AmTrust's growth. In November 2015 AmTrust filed a preliminary prospectus supplement and prospectus supplement with the SEC announcing an offer of 5 million shares of common stock (the "November 2015 Offering") pursuant to a registration statement filed on June 11,

2015 (the "2015 Registration Statement").  The transaction, underwritten by Defendants Citigroup Global Markets Inc. ("Citigroup") and Morgan Stanley & Co. LLC ("Morgan Stanley"), occurred on November 11, 2015 and raised $320 million.  In September 2016 AmTrust filed another preliminary prospectus supplement and prospectus supplement under the 2015 Registration Statement, this time announcing that the company planned to offer American depositary shares in a transaction (the "September 2016 Offering") underwritten by Morgan Stanley, UBS Securities LLC ("UBS"), RBC Capital Markets, LLC ("RBC"), and Keefe, Bruyette & Woods, Inc. ("KBW").  The prospectus supplement accompanying the September 2016 Offering incorporated by reference AmTrust's annual financial report on Form 10-K for the year ending December 31, 2015, its 10-Q report for the quarter ending March 31, 2015, and various other reports the company had previously filed with the SEC.  The September 2016 Offering raised $278.2 million.

AmTrust's prospects took a turn for the worse in 2017.  In February and March 2017 AmTrust announced that accounting errors had prompted it to delay the filing of its 10-K for the year ending December 31, 2016 and that it needed more time to complete its consolidated financial statements.  On April 4, 2017,

AmTrust finally filed its Form 10-K for 2016. The 2016 10-K included restated financial results for the years ending December 31, 2012, 2013, 2014, 2015, and 2016, as well as each interim period during 2015 and 2016. The restatement revealed that the company's income and earnings had been significantly overstated since 2012.[5]

The restatement identified two material accounting errors. First, according to a press release that AmTrust issued describing the errors, AmTrust had mistakenly relied on the "upfront recognition of a portion of warranty contract revenue associated with administration services, . . . instead of deferring recognition of the revenue over the life of the contract." Joint App'x 208. In other words, AmTrust had "historically recognized the majority of revenue related to administrative services at the time of sale of ESP," but had "revised its application of the revenue recognition guidance to record revenue related to

---

[5] To use the annual financial results for 2015 as an example, the errors meant that income before other income, income taxes, equity in earnings of unconsolidated subsidiaries, and non-controlling interest was overstated by 16.79 percent; income before income taxes, equity in earnings of unconsolidated subsidiaries, and non-controlling interest was overstated by 17.04 percent; net income was overstated by 11.56 percent; net income attributable to AmTrust common stockholders was overstated by 12.62 percent; diluted earnings per share was overstated by 12.45 percent; comprehensive income was overstated by 22.94 percent; and comprehensive income attributable to AmTrust Financial Services, Inc. was overstated by 23.55 percent. See Joint App'x 213–14.

administration services on a straight-line basis over the term of the ESP

contracts." Joint App'x 80. The second accounting error was that discretionary

employee "bonuses . . . were expensed in the year paid but . . . should have been

accrued [as an expense] in the year earned based on" accepted accounting

standards. Joint App'x 208. The restatement also identified other "miscellaneous

adjustments" to AmTrust's financial statements that the company concluded

were not material.[6] Joint App'x 208.

## II.     **Procedural Background**

The Appellants commenced this putative class action in March 2017, after

AmTrust first publicly disclosed the accounting errors at issue in this case.

Although there are two slightly different class periods during which the

Appellants purchased AmTrust securities—the first between February 14, 2013

and April 10, 2017 (the "AmTrust Class Period") and the second between March

3, 2014 and April 10, 2017, during which BDO served as AmTrust's outside

auditor (the "BDO Class Period")—for our purposes, the distinction is

immaterial. The Appellants eventually filed a second amended complaint

asserting claims under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C.

---

[6] Although the Appellants challenged other statements below, they do not press those arguments on appeal and, as a result, we do not consider them.

11

§§ 77k, 77l(a)(2), 77o, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5. The District Court dismissed the second amended complaint without prejudice, concluding for the most part that the alleged misstatements were nonactionable statements of opinion. The Appellants filed a third amended complaint (the operative complaint here), which the District Court also dismissed, largely for the same reasons, this time with prejudice.

This appeal followed.

## DISCUSSION

We review the District Court's dismissal under Rule 12(b)(6) de novo, accepting all factual allegations as true and drawing all reasonable inferences in favor of the Appellants. Olagues v. Icahn, 866 F.3d 70, 74 (2d Cir. 2017).

### I. The Securities Act Claims Against the AmTrust Defendants and the Director Defendants

We begin with the Appellants' claims against the AmTrust Defendants and the Director Defendants under Sections 11 and 15 of the Securities Act, as well as their claims against AmTrust under Section 12(a)(2) of the Securities Act. The Act requires that companies issuing securities make a "full and fair disclosure of information" in connection with a public offering. Pinter v. Dahl, 486 U.S. 622,

12

646 (1988); see Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura

Holding Am., Inc., 873 F.3d 85, 98 (2d Cir. 2017).  The Act aims to protect

investors and to "achieve a high standard of business ethics in the securities

industry."  Lorenzo v. SEC, 139 S. Ct. 1094, 1103 (2019) (quotation marks

omitted); see also SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1466 (2d Cir. 1996).

It thus permits purchasers of a public company's securities to sue the company

and certain corporate officers for any material misstatements or for the omission

of material information in the company's registration statements filed with the

SEC.

Section 11 of the Act, for example, provides:

> In case any part of the registration statement, when
> such part became effective, contained an untrue
> statement of a material fact or omitted to state a
> material fact required to be stated therein or necessary
> to make the statements therein not misleading, any
> person acquiring such security . . .  [may] sue.

15 U.S.C. § 77k(a); see Omnicare, Inc. v. Laborers Dist. Council Const. Indus.

Pension Fund, 575 U.S. 175, 179 (2015).  So "[i]n the event of such a misdeed, the

statute provides for a cause of action by the purchaser of the registered security

against the security's issuer, its underwriter, and certain other statutorily

enumerated parties."  In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347,

13

358 (2d Cir. 2010). "Section 15, in turn, creates liability for individuals or entities that 'control[ ] any person liable' under section 11." Id. (quoting 15 U.S.C. § 77o). And as relevant to this appeal, Section 12(a)(2) similarly imposes liability on any person who offers or sells a security by means of a prospectus containing material misrepresentations or omissions.[7]

Appellants' principal challenge under the Securities Act relates to the two accounting errors described above that AmTrust identified in its restatement as materially affecting its reported income during the relevant time: (1) its recognition of revenue from administration services based on the time-of-sale

---

[7] Section 12(a)(2) provides, in relevant part:

> Any person who . . . offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable . . . to the person purchasing such security from him . . . .

15 U.S.C. § 77l(a)(2).

approach; and (2) its decision to record discretionary bonus payments as expenses the year in which they were paid rather than the year in which the bonuses were actually earned.

Relying largely on the Supreme Court's decision in Omnicare and our decision in Fait v. Regions Financial Corp., 655 F.3d 105 (2d Cir. 2011), the District Court determined that AmTrust's financial statements reflected the exercise of subjective judgment and were thus non-actionable statements of opinion.  Cf. Omnicare, 575 U.S. at 184 (noting that an executive who expressed "a view, not a certainty" "could not be liable for a false statement of fact").  We respectfully disagree with this particular conclusion of the very able and experienced District Judge, who did not have the benefit of our latest guidance in this area.  See Abramson v. Newlink Genetics Corp., 965 F.3d 165 (2d Cir. 2020).

In Fait, we explained that "when a plaintiff asserts a claim under section 11 or 12 based upon a [defendant's alleged] belief or opinion . . . liability lies only to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed."  Fait, 655 F.3d at 110.  But we have since recognized that the Supreme Court in Omnicare, which was decided after Fait, unequivocally "rejected the proposition that there can be no liability based on a

15

statement of opinion unless the speaker disbelieved the opinion at the time it was made." Abramson, 965 F.3d at 175. By pointing out that a statement of opinion, even if believed, may nonetheless be actionable if it contains a factual misstatement or is rendered misleading by the omission of material facts, Omnicare expanded the scope of issuer liability for statements of opinion. Nevertheless, Fait continues to guide us in distinguishing between a statement of fact and a statement of opinion in the first place.

So what distinguishes a fact from an opinion under the federal securities laws? In general, a fact is "a thing done or existing or an actual happening," while an opinion is "a belief, a view, or a sentiment which the mind forms of persons or things." Omnicare, 575 U.S. at 183 (quotation marks omitted). A statement of fact "expresses certainty about a thing," while a statement of opinion does not. Id. Statements of opinion often include qualifying language (like "I believe" or "I think") that conveys a lack of certainty about the thing being expressed, marks the statement as reflecting the speaker's impression or point of view rather than an objective truth, and makes it easier to identify the statement as one of opinion rather than fact. See id. at 183–84.

16

But not all statements of opinion include such qualifying language. In Fait, for example, we held that unqualified estimates of goodwill and loan loss reserves were statements of opinion because the estimates were clearly "subjective . . . rather than objective factual matters." Fait, 655 F.3d at 111 (quotation marks omitted). Certain statements address issues so plainly subjective, we reasoned, that the statement is one of opinion not just by virtue of the words used but also because of the nature of the information conveyed. In Fait, we characterized the inquiry as turning on whether the relevant statement reflects the speaker's determination of "a matter of objective fact" or instead expresses the speaker's judgment about a matter that lacks "any objective standard." Id. at 109–10 (quotation marks omitted). The latter statement, we said, is "inherently subjective." Id. at 113.

The rule we articulated in Fait was narrowly invoked in the context of estimates of goodwill and loan loss reserves, both of which we characterized as inherently requiring a substantial exercise of judgment. Estimates of goodwill "depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed." Id. at 110. Absent "any objective standard such as market price that" the company "should have but failed to use in

17

determining" the value of its assets, "an estimate of the fair value of those assets will vary depending on the particular methodology and assumptions used." Id. at 110–11. Likewise, in Omnicare, the Supreme Court described an opinion variously as a statement that "in ordinary usage . . . does not imply . . . definiteness . . . or certainty," or as a statement that "rest[s] on grounds insufficient for complete demonstration." 575 U.S. at 183 (quotation marks omitted).

If a statement turns on the exercise of subjective judgment, a plaintiff will be unable to establish that it is false merely by showing that other reasonable alternative views exist. Where those alternatives exist, the speaker making the statement (expressing an opinion) can choose among them without running afoul of the federal securities provisions at issue here. See Omnicare, 575 U.S. at 189–90 ("Reasonable investors understand that opinions sometimes rest on a weighing of competing facts.") This is true even if most of the existing facts cut against the statement.

But opinions lead double lives. Most obviously, as the Supreme Court clarified in Omnicare and our Court more recently observed in Abramson, an opinion may implicitly convey "facts about how the speaker has formed the

18

opinion—or, otherwise put, about the speaker's basis for holding that view."

Omnicare, 575 U.S. at 188; see Abramson, 965 F.3d at 175–76.  In the context of a

securities transaction, a reasonable investor expects that opinion statements "rest

on some meaningful . . . inquiry," "fairly align[] with the information in the

issuer's possession at the time," and do not "reflect baseless, off-the-cuff

judgments," id. at 188–90; see Virginia Bankshares, Inc. v. Sandberg, 501 U.S.

1083, 1093 (1991) (noting that even "conclusory terms in a commercial context are

reasonably understood to rest on a factual basis that justifies them as accurate,

the absence of which renders them misleading").  If, for example, "a registration

statement omits material facts about the issuer's inquiry into or knowledge

concerning a statement of opinion, and if those facts conflict with what a

reasonable investor would take from the statement itself," then the issuer may be

liable under Section 11's omissions clause even though the statements convey an

opinion.  Omnicare, 575 U.S. at 189.  "By increasing the ability of plaintiffs to

plead material omissions with respect to statements of opinion . . . , Omnicare

reduced the significance of district courts' classification of statements as those of

fact or opinion."  Abramson, 965 F.3d at 176.

Opinions are thus actionable under Section 11 of the Securities Act not only when "the speaker did not hold the belief she professed," Omnicare, 575 U.S. at 185–86, but also if the statement of opinion contains embedded statements of fact that are untrue, or the statement omits information whose omission conveys false facts about the speaker's basis for holding that view and makes the opinion statement misleading to a reasonable investor, id. at 186–88; see Abramson, 965 F.3d at 175; Fait, 655 F.3d at 111 (noting that opinion "statements may be actionable if they misstate the opinions or belief held, or, in the case of statements of reasons, the actual motivation for the speaker's actions, and are false or misleading with respect to the underlying subject matter they address" (emphasis omitted)). The standard for opinion liability presents "no small task for an investor" seeking to plead that an opinion is misleading. Omnicare, 575 U.S. at 194.

So one of the more straightforward ways a statement of opinion may be actionable is if it contains an embedded statement of fact that is not true. In other words, the opinion may be false or misleading if the embedded fact is not one as to which reasonable minds can differ. This occurs where, for example, there is an accepted method for assessing whether the statement is true, but the statement is

20

not justified by the accepted method and clearly contradicts the facts on which it purports to rest. Consider the following example from <u>Abramson</u>:

> A statement structured, 'I believe that x is so because y has occurred,' contains the factual and falsifiable statement, 'y has occurred.' If y has in fact not occurred, the statement of opinion is actionable because an embedded but complete 'statement of a material fact' . . . can be proven false.

<u>Abramson</u>, 965 F.3d at 175.

Statements of opinion are also actionable as false or misleading under Section 11's omission clause if the opinion "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement [of opinion] itself." <u>Omnicare</u>, 575 U.S. at 188; <u>see</u> <u>Abramson</u>, 965 F.3d at 175 ("[P]laintiffs can allege that a statement of opinion, without providing critical context, implied facts that can be proven false."). "With respect to this [alternative] basis for challenging a statement of opinion, <u>Omnicare</u> held that the appropriate perspective for identifying whether a statement of opinion implies facts is that of the reasonable investor." <u>Abramson</u>, 965 F.3d at 175.

Mindful of these background principles, we conclude that the Appellants have stated a claim under Section 11 of the Securities Act against the AmTrust

21

Defendants and the Director Defendants based on AmTrust's past recognition of revenue for extended warranty contracts using the time-of-sale approach, as well as its practice of recording discretionary bonuses as expenses when they were paid rather than earned.[8]  For the same reasons, we vacate the District Court's dismissal of the Appellants' Section 12(a)(2) claims against AmTrust arising from the same misstatements.  See In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d at 359.

The Appellants claimed that the Defendants were also liable for improper reporting of acquisition costs, foreign exchange gains and losses, software costs, interest expenses, intercompany transactions, and other accounting-related statements.  They do not challenge the District Court's dismissal of those claims on appeal, and we therefore affirm the judgment insofar as it dismissed the

---

[8] The District Court dismissed the Appellants' control-person liability claim under Section 15 of the Securities Act against AmTrust's officers and directors because it found no primary liability under Section 11.  Because we conclude that the Appellants have stated a claim for primary liability for the statements about the accounting treatment of warranty contracts and bonuses, we vacate the District Court's dismissal of the corresponding Section 15 claims against Zyskind, Pipoly, DeCarlo, Fisch, Gulkowitz, Karfunkel, and Miller and remand for further proceedings consistent with this opinion.  See In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d at 358 (noting that "the success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under section[] 11").

claims.  We focus instead, as do the Appellants, on the claims relating to the

extended warranty contracts and the bonuses.

### A. **The Extended Warranties**

We turn first to AmTrust's practice of recognizing "upfront" most of the

revenue generated from its extended warranty contracts during the relevant

time.  In a March 2017 media release, AmTrust clarified that this revenue

recognition practice was "based on the interpretation of ASC [Accounting

Standards Codification] 605, Revenue Recognition, used in the previously filed

financial statements related to multiple-element revenue recognition."  Joint

App'x 670.  The company conceded, however, that it should have instead

"deferr[ed] recognition of the revenue over the life of the contract."[9]  Joint App'x

670.  The restatement acknowledged that the time-of-sale approach resulted in

---

[9] The Accounting Standards Codification ("ASC") is the "source of authoritative generally accepted accounting principles," commonly referred to as "GAAP," published by the Financial Accounting Standards Board ("FASB") "to be applied by nongovernmental entities" such as AmTrust.  Financial Accounting Standards Board, Accounting Standards Codification: Overview and Background 105-10-05-1 (2020), https://asc.fasb.org/1943274/2147479442; see also Ind. Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 93 (2d Cir. 2016) (relying on FASB standards as a source of GAAP).

23

material misstatements regarding AmTrust's income and revenue associated with the warranty contracts. Specifically, it explained:

> The Company has historically recognized the majority of revenue related to administration services at the time of the sale of ESP. However, the Company revised its application of the revenue recognition guidance to record revenue related to administration services on a straight-line basis over the term of the ESP contracts. This correction of an error, <u>which created an overstatement of service and fee income and an overstatement of other expenses that were also recognized upfront in current periods</u>, required a restatement of the Company's previously issued financial statements.

Joint App'x 568 (emphasis added).

On appeal, AmTrust describes its initial representations about the revenue related to administrative services for ESPs as statements of opinion, not fact, because its determination of when to recognize the revenue associated with ESPs was a subjective judgment call. In particular, AmTrust explains that its pre-restatement decision to recognize this revenue upfront was "based on its interpretation of the accounting guidance regarding 'multiple-element revenue recognition,'" including ASC 605-25-25-5. AmTrust Br. 31. ASC 605-25-25-5 governs when a "delivered item or items shall be considered a separate unit of accounting." Under that accounting standard, revenue from these multi-element

24

arrangements (also known as bundled contracts or sales) can be recognized upon delivery only if the contracts or services "have value to the customer on a standalone basis." ASC 605-25-25-5(a), superseded by Accounting Standard Update No. 2014-09 (May 28, 2014). Lastly, AmTrust observes that a contract or service has "value on a standalone basis if [it is] sold separately by any vendor or the customer could resell [it] on a standalone basis." Id.

The company suggests that assessing value to the customer on a standalone basis—that is, determining whether the administrative services revenue received from vendors who administer the warranty programs is separable from revenue generated by the warranty coverage provided to customers—is an inherently subjective enterprise. The problem with this argument is that AmTrust has never actually contended that its customers can resell the administrative services associated with the warranty contracts at issue here on a standalone basis or that vendors are able to sell them separately. Nothing in the Complaint suggests that doing so is even possible, and although AmTrust maintains that there are other ways to determine a contract's "value on a standalone basis" under the services section of ASC 605 that require judgment

calls, nothing in the text of ASC 605, including ASC 605-25-55-1, on which

AmTrust also relies, refers to other methods for determining value.

In further support of their respective arguments, both the Appellants and

AmTrust turn to ASC 605-20-25-3, which provides:

> [R]evenue from separately priced extended warranty or product maintenance contracts shall be deferred and recognized in income on a straight-line basis over the contract period except in those circumstances in which sufficient historical evidence indicates that the costs of performing services under the contract are incurred on other than a straight-line basis.

ASC 605-20-25-3 (emphasis added), superseded by Accounting Standards

Update No. 2014-09 (May 28, 2014). On one hand, the Appellants suggest that

ASC 605-20-25-3 establishes an objective standard that generally requires the

recognition of this revenue on a straight-line basis. On the other hand, AmTrust

defends the District Court's decision by relying on the exception contained in

ASC 605-20-25-3, claiming that the determination of whether historical evidence

is sufficient to permit non-straight-line treatment is "a quintessential question of

judgment" and that the standard is thus inherently subjective. AmTrust Br. 30–

31.

For its part, the District Court concluded that the restated financial statements were non-actionable opinions because determining the sufficiency of historical evidence that would support incurring costs on a non-straight-line basis "inherently requires a subjective judgment as to whether the exception applies."  Spec. App'x 89.  As the District Court itself recognized, however, the determination that AmTrust's statements are opinion, not fact, is not necessarily the end of the analysis.  Spec. App'x 42 ("The claim will survive . . . if plaintiffs have alleged adequately that the statement was an untrue or misleading statement of opinion."); see Abramson, 965 F.3d at 176.

The Appellants respond that they have alleged the objectively determinable absence of historical evidence necessary to support the non-straight-line accounting approach that AmTrust applied.  See Joint App'x 152 ("ASC Topic No. 605 . . . does not permit the method of recognition employed by AmTrust without historical evidence demonstrating the appropriateness of such method, historical evidence AmTrust acknowledges it never possessed.").  AmTrust's reliance on the sufficiency of historical evidence to justify its accounting treatment, the Appellants contend, runs headlong into the

Complaint's allegation, which at this stage we accept as true, that there was in fact <u>no</u> historical evidence to support its approach.

We agree with the Appellants that subjective judgments about the sufficiency of historical evidence to support a particular accounting treatment presuppose the existence of <u>some</u> historical evidence. Indeed, AmTrust now acknowledges that it should have recorded revenue for its warranty contracts on a straight-line basis in reliance on ASC 605-20-25-3. And no one disputes that GAAP permits time-of-sale recognition only if <u>some</u> historical evidence justified doing so. At the pleading stage, we think the alleged absence of such evidence, if accepted as true, means that AmTrust's representations about the warranty contract revenue reported in its historical consolidated financial statements misled investors to conclude that the company was aware of some historical evidence in support of recognizing the revenue on a non-straight-line basis, when in (alleged) fact it was not. In other words, AmTrust is plausibly alleged to have "sa[id] one thing and [held] back another." <u>Omnicare</u>, 575 U.S. at 192.

We therefore conclude that AmTrust's financial statements relating to the warranty contract revenue reported in its historical consolidated financial statements were actionable statements of opinion under Section 11, and we

28

vacate the District Court's dismissal of the Appellants' Section 11 claims against the AmTrust Defendants and the Director Defendants arising from those statements.

## B. **The Discretionary Bonuses**

We turn next to AmTrust's practice of expensing certain discretionary employee bonuses in the year the bonuses were paid rather than the year the bonuses were earned.

According to the Complaint, in its restatement AmTrust "admitted that the financial statements it issued to investors during the relevant period were presented in violation of GAAP by failing to timely accrue compensation related expenses." Joint App'x 83. Specifically, AmTrust explained that:

> In prior years, the Company had expensed discretionary bonuses paid to its employees in the year the bonuses were paid because the Company did not consider the discretionary bonuses to be "probable," which is the standard required for accrual. Upon review of ASC 270, Interim Reporting, and ASC 450, Contingencies, management determined that its application was incorrect because, even though the bonuses were discretionary, the bonuses should have been estimated and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

29

Joint App'x 83.

The parties agree that ASC 450 applies to determine how to account for these bonuses. Under ASC 450-20-25-2, companies should expense costs when it is "probable" that a liability has been incurred and when "[t]he amount of loss can be reasonably estimated" within a range.[10] AmTrust asserts that its decision to expense bonuses in the period they were paid rather than earned in its previously issued consolidated financial statements is a classic exercise of subjective judgment. Suggesting to investors that it is not "probable" that the company would pay bonuses at a future time is, the company asserts, merely stating a non-actionable opinion. Even assuming without deciding that these are statements of opinion, we are not persuaded.

In our view, there is some reason to conclude that the Appellants have plausibly alleged that AmTrust's method of deferring the recognition of expenses related to bonuses until the bonuses were paid (thus delaying the charge to income) was objectively improper rather than an exercise of subjective judgment. In particular, the Appellants allege that AmTrust had a practice of paying

---

[10] See also ASC 450-10-55-3 ("Amounts owed for services received. . . are not contingencies even though the accrued amounts may have been estimated; there is nothing uncertain about the fact that those obligations have been incurred.")

bonuses.  The Complaint thus plausibly alleges that there was no basis to conclude that the continued payment of earned bonuses was not "probable" and that such bonuses therefore could not be expensed when earned.  There is no dispute that the bonuses at issue on appeal were earned during the relevant periods and, as AmTrust's restatement eventually acknowledged, that they should have been expensed during those periods.  Although multiple accounting standards may have been relevant to determining when to expense a bonus, all of the standards in play here support the position that the bonuses should have been expensed in the year they were earned, not the year they were paid.[11]  We are not aware of any GAAP provision on which AmTrust relied that suggests otherwise.  And the fact that these GAAP standards, together or alone, are subject to misreading, misinterpretation, or misapplication, as happened here, does not necessarily mean that they entail an exercise of subjective judgment.

But we do not need to decide whether these financial statements are statements of fact or, as AmTrust asserts, statements of opinion.  See Abramson, 965 F.3d at 176.  Even if they are statements of opinion (because, say,

---

[11] Under ASC  450-10-55, bonuses should have been expensed as incurred during the relevant period.  ASC 710-10-25 likewise required AmTrust to expense an employee's right to be compensated when earned.  And ASC 270 required the bonuses to be expensed as incurred in interim periods.

determining whether it is "probable" that the corporate officers would exercise their discretion to pay the bonuses at a future time is a matter of subjective judgment), we conclude that the statements are nonetheless actionable because the Complaint adequately alleges that it was improbable that the earned bonuses would not be paid. Accepting that allegation as true makes it quite plausible that the AmTrust Defendants did not base the company's statements of probability on a "meaningful . . . inquiry," that their statements did not "fairly align[] with the information in the issuer's possession at the time," and that there was no basis for AmTrust to state that the bonuses should be expensed in the year they were paid rather than earned. Omnicare, 575 U.S. at 188–89.

For these reasons, we conclude that the Complaint states a claim under Section 11 against the AmTrust Defendants and the Director Defendants arising from AmTrust's misrepresentation of reported income in its historical consolidated financial statements based on the erroneous accounting treatment relating to bonus payments.

## C. SOX Certifications by AmTrust Executives

The remaining Section 11 claims against the AmTrust Defendants are a different matter. They rest on certifications by company executives regarding,

32

among other things, the accuracy of AmTrust's financial reporting, its conformity with GAAP, and the effectiveness of AmTrust's disclosure controls and procedures. The District Court concluded that these certifications were non-actionable statements of opinion. We agree.

First, the Officer Defendants, Zyskind (the CEO) and Pipoly (the CFO), attested to (1) the accuracy of AmTrust's financial reporting, (2) the effectiveness of the company's disclosure controls and procedures, and (3) their disclosure of any weaknesses in internal controls over the company's financial reporting in certifications mandated by Section 302 of the Sarbanes Oxley Act ("SOX"), 15 U.S.C. § 7241(a); see also 17 C.F.R. §§ 240.13a-14, 240.13a-15, 240.15d-15. Their certifications about the accuracy of AmTrust's financial reporting, including that financial statements were prepared in conformity with GAAP, signal that they are opinions by stating that they are "based on [the] knowledge" of the officer. See Joint App'x 103–04, 153. There is no allegation that the opinion is actionable on the ground that it was not based on the officer's knowledge.[12] Similarly, we conclude that the two other challenged SOX certifications relating to (1)

---

[12] For the reasons discussed below, we disagree with the Appellants that the existence of the Warrantech SEC guidance letter demonstrates that the officers knew the financial reports were false or misleading or did not comply with GAAP, even with all reasonable inferences drawn in the Appellants' favor.

disclosure controls and procedures, and (2) internal control over financial reporting contain language that conveys management's subjective judgments about the company's internal controls and thus constitute statements of opinion.

The Appellants point to allegations that AmTrust later reversed course and that its restatement acknowledged a failure of internal controls. The Appellants insist that the reversal compels the inference that the SOX certifications were not believed when made. But AmTrust's change of opinion, standing alone, does not mean that the original certified opinions were disingenuous.[13] Nor is a genuinely held opinion that "turned out to be wrong" necessarily actionable. Omnicare, 575 U.S. at 186. In any event, as noted, the Complaint fails to adequately allege that the AmTrust executives who signed the certifications did not believe what they certified.

Finally, Appellants contend that the certifications were misleading because they falsely conveyed the existence of "some meaningful . . . inquiry" conducted by the certifying executives. Appellants' Br. 42 (quoting Omnicare, 575 U.S. at 188). But here too, the Complaint fails to allege any facts that establish a lack of

---

[13] The Appellants reference in passing on appeal that the SOX certifications contained embedded statements of fact. See Appellants' Br. 41. We conclude that the argument is abandoned because the Appellants have failed to develop it. See Zhang v. Gonzales, 426 F.3d 540, 545 n.7 (2d Cir. 2005).

meaningful inquiry, other than the fact that the certification turned out to be wrong.

For these reasons, we affirm the District Court's dismissal of the Appellants' Section 11 claims relating to the SOX certifications.

## II.      The Exchange Act Claims Against the AmTrust Defendants

The District Court also dismissed the Appellants' claims against the AmTrust Defendants under Section 10(b) of the Exchange Act and Rule 10b-5. To survive a motion to dismiss under these provisions, "a plaintiff must allege that [each] defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 105 (2d Cir. 2007); see also Ind. Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 93 (2d Cir. 2016).  Under the Private Securities Litigation Reform Act of 1995, moreover, a

plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." 15 U.S.C. § 78u–4(b)(2)(A).

In contrast to the Securities Act claims under Section 11, which do not require a showing of scienter,[14] the central question with respect to the Appellants' claims under the Exchange Act is whether the Complaint adequately "pleaded facts giving rise to a strong inference that the . . . Defendants acted with 'scienter, a mental state embracing intent to deceive, manipulate, or defraud.'" In re Advanced Battery Techs., Inc., 781 F.3d 638, 644 (2d Cir. 2015) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007)). Scienter may be established by alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99; see Set Cap. LLC v. Credit Suisse Grp. AG, 996 F.3d 64, 78 (2d Cir. 2021). Any allegation of conscious misbehavior or recklessness should be "viewed holistically and together with the allegations of motive and

---

[14] As we explained in Fait, "[w]hile issuers are subject to virtually absolute liability under section 11, the remaining potential defendants under sections 11 and 12(a)(2) [of the Securities Act] may be held liable for mere negligence." Fait, 655 F.3d at 109 (cleaned up). And "in contrast to claims brought pursuant to section 10(b) of the [Exchange Act], claims under sections 11 and 12 do not require allegations of scienter." Id.

opportunity" to determine whether the complaint supports a strong inference of scienter. Set Cap. LLC, 996 F.3d at 78. Although "the requisite intent of the alleged speaker of the fraud need not be alleged with great specificity," Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996), the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314; see also In re Advanced Battery, 781 F.3d at 644; ECA & Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009).

Keeping that standard in mind, we agree with the District Court that the Complaint does not adequately allege that the AmTrust Defendants acted with scienter.

First, the Complaint does not adequately plead scienter based on the AmTrust Defendants' motive and opportunity to commit fraud. Urging otherwise, the Appellants rely on the AmTrust Defendants' financial incentives to keep share prices high and to fuel the company's acquisition strategy. But the desire to sustain "the appearance of corporate profitability" is not itself the kind of incentive or motivation that raises an inference of scienter. Chill, 101 F.3d at

37

268. The Appellants also direct us to allegations that Pipoly and other top executive officers (but, notably, not Zyskind or the Board Defendants) sold a significant number of shares of AmTrust stock during the AmTrust Class Period. In doing so, however, the Appellants acknowledge that Pipoly's significant selloff began several months before the AmTrust Class Period, a fact that renders his stock sales during this class period less unusual. See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co., 28 F.4th 343, 355 (2d Cir. 2022).

Nor does the Complaint allege facts that provide "strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99. We have explained that "[s]cienter based on conscious misbehavior . . . requires a showing of deliberate illegal behavior, a standard met when it is clear that a scheme, viewed broadly, is necessarily going to injure." Gould v. Winstar Commc'ns, Inc., 692 F.3d 148, 158 (2d Cir. 2012) (quotation marks omitted). Recklessness, meanwhile, entails "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." ECA, 553 F.3d at 198 (quotation marks omitted). None of the facts alleged in the Complaint— including the "magnitude" of the restatement and the duration of the period it

38

covered—satisfy these requirements. Joint App'x 213. In determining whether the AmTrust Defendants acted with scienter, it is not enough that it took a period of years for AmTrust to acknowledge its significant accounting errors.

Finally, the Appellants argue that the AmTrust Defendants did not believe their accounting judgments regarding the early recognition of revenue on the administration-service fees connected to AmTrust's warranty program. The Appellants allege that AmTrust knew its accounting treatment was wrong because Warrantech, the company AmTrust acquired in 2010, announced in its Form 10-K for the year ending March 31, 2006 that it had changed its revenue-recognition practices regarding its warranty contracts in response to SEC guidance. In particular, the Complaint alleges that AmTrust must have known, or recklessly disregarded, that the SEC earlier had advised Warrantech that its time-of-sale approach was improper and that its warranty business compelled a straight-line revenue recognition approach. But we think that AmTrust's subsequent resort to a time-of-sale approach for the contracts, though wrong, is more plausibly explained by the changes to the guiding accounting principles

since 2006 to which AmTrust points us, or to AmTrust's negligence.[15]  See

AmTrust Br. 42–44.  Negligence, even in a "heightened form," is not sufficient to

allege scienter.  Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000).

For these reasons, we conclude that the Complaint fails to raise a strong

inference of scienter, and we affirm the dismissal of the Appellants' claims

against the AmTrust Defendants under Section 10(b) and Rule 10b–5.[16]  We also

affirm the District Court's corresponding dismissal of the Appellants' control-

person claim under Section 20(a) of the Exchange Act because such a claim is

"necessarily predicated on a primary violation of securities law."  Rombach v.

Chang, 455 F.3d 164, 177–78 (2d Cir. 2004).

---

[15] The Appellants also call our attention to purported "red flags" in the form of press coverage criticizing AmTrust's accounting practices generally, although none of the press articles mentions the two central accounting issues that led to AmTrust's restatement.  Given the generality of these media reports, we are not persuaded that they support an inference of scienter that is at least as compelling as any opposing inference of nonfraudulent intent.

[16] We have applied the holding in Omnicare to claims brought under Section 10(b) of the Exchange Act.  See Tongue v. Sanofi, 816 F.3d 199, 209–10 (2d Cir. 2016).  Because, as we previously concluded, the Officer Defendants' certifications are non-actionable statements of opinion, we also affirm the dismissal of the Appellants' Section 10(b) claims based on these certifications.  See City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp., 679 F.3d 64, 67–68 (2d Cir. 2012) (noting that Section 10(b) and Section 11 claims "share a material misstatement or omission element").

**III**. **The Securities Act Claims Against the Underwriter Defendants**

The Appellants also assert claims against the Underwriter Defendants under Sections 11 and 12(a)(2) of the Securities Act stemming from the two securities offerings made pursuant to AmTrust's 2015 Registration Statement. The first is AmTrust's November 2015 Offering, underwritten by Citigroup and Morgan Stanley, of 5 million shares of common stock pursuant to a preliminary prospectus supplement and a prospectus supplement. This preliminary prospectus supplement and prospectus supplement, together with the 2015 Registration Statement, incorporated by reference AmTrust's annual financial report for 2014 and quarterly financial reports for the first three fiscal quarters of 2015. The second offering is AmTrust's September 2016 Offering, underwritten by Morgan Stanley, RBC, UBS, and KBW, of 10 million depositary shares pursuant to a preliminary prospectus supplement and a prospectus supplement that, together with the 2015 Registration Statement, incorporated by reference AmTrust's annual financial report for 2015 and quarterly financial reports for the first two quarters of 2016. Each of the relevant financial reports contained

overstated income numbers arising from the time-of-sale approach for the warranty contracts and the improper expensing of bonuses.

As a threshold matter, three of the Underwriter Defendants—Morgan Stanley, UBS, and KBW—contend that the Appellants lack standing to even assert Section 12 claims against them in connection with the September 2016 Offering because the Complaint does not specifically allege that the Appellants purchased securities from those underwriters.[17]  Under Section 12(a)(2), a plaintiff has standing to bring an action against the seller of a security only if the plaintiff is "the person purchasing such security from them."  Akerman v. Oryx Commc'ns, Inc., 810 F.2d 336, 344 (2d Cir. 1987) (quotation marks omitted); see also Freidus v. Barclays Bank PLC, 734 F.3d 132, 141 (2d Cir. 2013) ("In order to have standing under § 12(a)(2), . . . plaintiffs must have purchased securities directly from the defendants."); 15 U.S.C. § 77l(a).  A "statutory seller" may include an underwriter who successfully solicited the transfer of title from issuer

_____

[17] The Underwriter Defendants do not challenge Appellants' standing to sue the underwriters of the November 2015 Offering—Citigroup and Morgan Stanley—or their standing to sue RBC for the September 2016 Offering.

42

to purchaser in exchange for some financial gain.[18]  Morgan Stanley, UBS, and KBW assert that in a case involving multiple underwriters of a single offering, the purchaser of a security must in its pleadings specifically identify which underwriter sold the security at issue in order to have standing to sue that underwriter.  We have not yet addressed this question.

We conclude that the Appellants have adequately established standing under Section 12(a)(2) by alleging that they purchased securities pursuant to the "pertinent offering documents" or in the relevant offerings underwritten by the defendants.  In re Lehman Bros. Sec. & ERISA Litig., 799 F. Supp. 2d 258, 311 (S.D.N.Y. 2011) (Kaplan, J.).  Here, according to the Complaint, the Appellants bring their Section 12(a)(2) claims on their own behalf and on behalf of "other members of the Securities Act Class who purchased AmTrust common stock or [shares sold in connection with the September 2016 Offering] pursuant to the Prospectuses."  Joint App'x 132 (emphasis added).  We can reasonably infer from

---

[18] In a similar vein, a purchaser of a security has standing to bring an action under Rule 10b–5a against underwriters (and brokers, dealers, and non-issuer sellers) for material misstatements about the security "if those entities made material misstatements about the security, as long as the plaintiff[] purchased or sold the securities about which the misstatements were made."  Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd., 54 F.4th 82, 88 (2d Cir. 2022); see In re NYSE Specialists Sec. Litig., 503 F.3d 89, 102 (2d Cir. 2007).

these allegations that the Appellants acquired securities from the Underwriter Defendants in connection with the September 2016 Offering.  We are therefore satisfied that the allegations suffice to establish the Appellants' standing in this case.  See, e.g., John v. Whole Foods Mkt. Grp., Inc., 858 F.3d 732, 736–38 (2d Cir. 2017) (noting that "general factual allegations of injury may suffice" to establish standing, "for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim" (cleaned up)).

Turning to the merits, the District Court dismissed the Appellants' Section 11 and Section 12 claims against the Underwriter Defendants, concluding that the Appellants had "fail[ed] to allege any untrue or misleading statements of material fact or opinion with respect to those claims."  Spec. App'x 73.  In other words, the District Court dismissed these claims, which it described as "identical to those of the Securities Act claims asserted against the AmTrust [D]efendants," for effectively the same reasons it dismissed the claims against the AmTrust Defendants.  Spec. App'x 73.  For reasons we have already provided, we disagree with the District Court's conclusion that the reported income statements related to AmTrust's warranty contracts and its employee bonuses were non-actionable

opinions. Insofar as the District Court dismissed the Appellants' claims under Section 11 and Section 12(a)(2) against the Underwriter Defendants arising from those two categories of statements, we vacate the dismissal and remand for further proceedings consistent with this opinion. As to any remaining claims against the Underwriter Defendants, we affirm the District Court's dismissal.

## IV.    **The Claims Against BDO, AmTrust's Outside Auditor**

Finally, we address the Appellants' claims against AmTrust's outside auditor, BDO, under Section 11 of the Securities Act in connection with BDO's audit reports on AmTrust's financial statements and its system of internal controls over financial reporting for each of the years ending December 31, 2013–15, and under Section 10(b) of the Exchange Act and Rule 10b-5 in connection with its audit report for the year ending December 31, 2013 ("2013 Audit Opinion"), which was included in AmTrust's 2013 Form 10-K.

We begin with the Securities Act claims. Section 11 provides in relevant part that if "any part of the registration statement . . . contained an untrue statement of material fact," anyone acquiring the associated security may sue "every accountant . . . who has with his consent been named as having prepared or certified any part of the registration statement or . . . any report or valuation

which is used in connection with the registration statement."  15 U.S.C. § 77k(a)(4).  BDO is thus responsible under Section 11 for any material inaccuracy in the AmTrust registration statements that it certified, or in financial reports incorporated in those statements.  Id.; see Miyahira v. Vitacost.com, Inc., 715 F.3d 1257, 1265 (11th Cir. 2013); Belizan v. Hershon, 495 F.3d 686, 692 (D.C. Cir. 2007); see also Herman & MacLean v. Huddleston, 459 U.S. 375, 381 n.11 (1983).

As BDO observes, the Appellants have not developed the argument in their opening brief challenging the District Court's dismissal of the Section 11 claim against BDO.  The challenge, if it can be called that, appears in a footnote. See Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998) ("[A]n argument made only in a footnote [i]s inadequately raised for appellate review.").  Although the Appellants develop the argument somewhat in their reply brief, that is too little too late.  See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V., 412 F.3d 418, 428 (2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are waived even if the appellant . . . raised them in a reply brief.").  We thus conclude that the Appellants' challenge to the dismissal of the Section 11 claim against BDO is abandoned, we affirm the District Court's dismissal of that claim, and we proceed to examine the Exchange Act claims against BDO.

46

The Appellants contend that BDO is liable under Section 10(b) of the Exchange Act for the 2013 Audit Opinion, which stated that BDO had conducted its audit in accordance with standards promulgated by the Public Company Accounting Oversight Board ("PCAOB"), and that the audit provided a reasonable basis for BDO to determine that AmTrust's financial statements were fairly presented. Joint App'x 246–47.

On its face, the 2013 Audit Opinion appears in the same guise as the SOX certifications that we have already concluded are non-actionable opinions. But the Complaint alleges some key facts that differentiate the audit opinion from those certifications. The Appellants allege that the BDO engagement partner on the audit, Richard J. Bertuglia, and another BDO partner, John W. Green, in fact failed to complete the necessary checks and audit work papers before issuing the audit opinion; that they signed several audit work papers without reviewing them; and that they failed to verify that all the necessary audit work was performed before issuing the opinion. The Appellants also allege that the SEC later found that (1) Bertuglia had violated the PCAOB standards by failing to supervise and exercise due professional care, properly examine journal entries for evidence of possible material misstatement due to fraud, or perform sufficient

47

tests of internal controls and substantive audit procedures to support their final opinion, and (2) Green violated PCAOB standards by failing to perform the appropriate engagement quality review.

We agree with the District Court that the Appellants have adequately alleged that BDO's audit opinion contained potentially actionable misstatements of opinion because the Complaint "render[s] it plausible that Bertuglia," who signed the audit opinion, "disbelieved the statement that the audit was conducted in accordance with the relevant PCAOB standards." Spec. App'x 78. The Appellants have also adequately alleged that BDO's statement that it "believe[d] [its] audits provide a reasonable basis for [its] opinion," Joint App'x 246–47, would lead a reasonable investor to conclude that BDO had conducted "some meaningful . . . inquiry," Omnicare, 575 U.S. at 188, when in fact, according to the Complaint, BDO never conducted such an inquiry.

We part ways with the District Court, however, insofar as it concluded that the alleged misstatements were not material.

> To state a claim under § 10(b) and the corresponding Rule 10b–5, a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's

48

> reliance on the defendant's action caused injury to the plaintiff.

Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000). "At the pleading stage, a plaintiff satisfies the materiality requirement . . . by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." Id. at 161–62; see Basic Inc. v. Levinson, 485 U.S. 224, 231–32 (1988). "[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Ganino, 228 F.3d at 162 (quotation marks omitted); see Litwin, 634 F.3d at 717.

With these basic principles in mind, we conclude that the Appellants adequately alleged that the misstatements in BDO's 2013 Audit Opinion were material. Although the challenged audit certification reflects standardized language, it is not "so general that a reasonable investor would not depend on it as a guarantee." ECA, 553 F.3d at 206. Instead, BDO's certification that the audit was conducted in accordance with PCAOB standards succinctly conveyed to investors that AmTrust's audited financial statements were reliable. The absence of BDO's certification would have been significant, for without it, BDO could not

49

have issued an unqualified opinion, AU 508.07, which then would have alerted investors to potential problems in the company's financial reports, see United States v. Arthur Young & Co., 465 U.S. 805, 818 (1984). The false certification thus subjected unknowing investors to the risk that AmTrust's financial statements were unreliable. For that reason, contrary to the District Court's conclusion, the Appellants were not required to allege a link between BDO's false certification and specific errors in AmTrust's financial statements to establish that BDO's false audit certification was material.

We also respectfully disagree with the District Court's conclusion that the Appellants failed to allege loss causation. Because the Appellants rely on a corrective disclosure theory, they must show that "the loss caused by the alleged fraud results from the relevant truth leaking out." In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 261 (2d Cir. 2016) (cleaned up). More specifically, the Appellants "must plausibly allege a disclosure of" BDO's misstatements by which "the available public information regarding" BDO's audit opinion "was corrected." Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 233 (2d Cir. 2014) (cleaned up).

The Complaint alleges that BDO's misleading representations regarding the 2013 Audit Opinion caused investor losses because the unqualified audit opinion artificially inflated the price of AmTrust securities.  As noted, at the time BDO issued its audit opinion, it had not completed the necessary audit work.  Its auditors completed the work after BDO issued the unqualified opinion and concluded that they did not need to revise the opinion.  Even then, the audit partners failed to note their assessment of omitted procedures or to revise the audit documentation to show that the work was completed only *after* the opinion had been issued.

An April 2017 article in the Wall Street Journal disclosed the debacle.  The article reported that BDO auditors failed to complete the necessary checks before signing off on the audit paperwork.  The article also described how BDO auditors covered up their incomplete work by "loading unfinished documents into an internal software system to show the right time stamp, then returned later to complete some of the work."  Joint App'x 262 (quotation marks omitted).  After the article was published, the price of AmTrust's securities dropped.

Relying on the three-year gap between BDO's completion of the audit work and the disclosure in the Wall Street Journal, the District Court concluded

51

that the Appellants failed to allege loss causation.  In the District Court's view,

the Appellants needed to allege a disclosure and corresponding decline in the

price of AmTrust's securities between the time BDO issued its misleading audit

opinion and the time that BDO retroactively completed the work.  See Lentell v.

Merrill Lynch & Co., 396 F.3d 161, 175 n.4 (2d Cir. 2005) (explaining that the

plaintiffs could not establish loss causation based on a disclosure that did not

"reveal to the market the falsity of the prior" statements).

We disagree with this view for two reasons.  First, the Wall Street Journal

article was the first time that the problems with BDO's audit were publicly

disclosed.  Prior to the disclosure, the misleading nature of BDO's audit

certification remained uncorrected, "continu[ing] to taint the total mix of

available public information."  Carpenters Pension Tr. Fund, 750 F.3d at 234

(cleaned up).  Because the article revealed the specific deficiencies that rendered

the audit opinion misleading, there is a "clean match" between the misleading

audit opinion and the subsequent disclosure.  Ark. Tchr. Ret. Sys. v. Goldman

Sachs Grp., Inc., 77 F.4th 74, 80 (2d Cir. 2023).  Second, even after cleaning up

their auditing paperwork, BDO's auditors still failed to correct that paperwork to

reflect the dates the work was actually completed or to document their

assessment of the omitted procedures. So BDO's statement that it "conducted [its] audits in accordance with the standards of the Public Company Accounting Oversight Board," Joint App'x 246, remained at the very least misleading. See, e.g., AS 3.6 (requiring the auditor to document "the procedures performed" with "sufficient information to enable an experienced auditor" to determine "the date such work was completed as well as the person who reviewed the work and the date of such review"). Accordingly, despite BDO's belated completion of the audit work, the Wall Street Journal article's disclosure of the deficiencies in BDO's audit revealed the continuing falsity of its audit certification.

Because the District Court dismissed the Appellants' Section 10(b) and Rule 10b-5 claims against BDO on materiality and loss causation grounds, it did not address scienter. Addressing that issue in the first instance on appeal, we conclude that the Appellants adequately alleged that BDO acted recklessly in conducting the audit and issuing the audit opinion. In particular, the Appellants alleged that BDO senior partners and managers—Bertuglia, Green, and Lev Nagdimov—knew that the audit did not comply with PCAOB standards and consciously concealed their noncompliance. These allegations support a strong inference of fraudulent intent. See Emps.' Ret. Sys. of Gov't of the Virgin Islands

v. Blanford, 794 F.3d 297, 308 (2d Cir. 2015) (holding that allegations describing the defendants' efforts to conceal information demonstrate fraudulent intent).[19]

BDO argues that the Appellants failed to establish scienter because they did not allege that BDO's conduct "approximate[d] an actual intent to aid in the fraud being perpetrated by" AmTrust. In re Advanced Battery, 781 F.3d at 644; accord Novak, 216 F.3d at 309 (holding that accounting irregularities "do[] not constitute reckless conduct sufficient for § 10(b) liability"). But the Appellants do not rely on mere accounting irregularities or BDO's failure to identify problems with AmTrust's accounting practices. Rather, they allege that BDO consciously covered up its *own* misrepresentation that its audit complied with PCAOB standards. For these reasons, we vacate the District Court's dismissal of the Appellants' Exchange Act claims under Section 10(b) and Rule 10b-5 against BDO.

---

[19] BDO argues that the Appellants failed to allege that any individual whose intent could be imputed to BDO acted with the requisite scienter. See Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc., 531 F.3d 190, 195 (2d Cir. 2008). We disagree. BDO concedes that Bertuglia, the engagement partner for the AmTrust audit, was the "maker" of the misleading audit certification. BDO Br. 45. And the Appellants alleged that Bertuglia did not review all of the audit paperwork or confirm that the auditors had obtained sufficient evidence to support their opinion, but he released the unqualified audit certification anyway. These allegations support a strong inference that Bertuglia knew that BDO's audit opinion was misleading insofar as the opinion falsely asserted that BDO conducted its audit in accordance with PCAOB standards.

## CONCLUSION

To summarize:

1. We vacate the dismissal of the Appellants' Section 11 claims against the AmTrust Defendants and the Director Defendants, the Section 12(a)(2) claims against AmTrust, and the Section 15 claims against the Officer Defendants and Director Defendants (Zyskind, Pipoly, DeCarlo, Fisch, Gulkowitz, Karfunkel, and Miller) relating to AmTrust's accounting for certain warranty contracts and bonuses.

2. We vacate the dismissal of the Appellants' claims under Section 11 and Section 12(a)(2) against the Underwriter Defendants relating to AmTrust's accounting for certain warranty contracts and bonuses.

3. We vacate the dismissal of the Appellants' claims under Section 10(b) and Rule 10b-5 against BDO.[20]

4. We otherwise affirm the judgment of the District Court.

We have considered the Appellants' remaining arguments and conclude that they are without merit. Accordingly, for the reasons set forth above, the judgment of the District Court is AFFIRMED in part and VACATED in part, and the case is REMANDED for proceedings consistent with this opinion.

---

[20] After due consideration of the Appellants' petition for rehearing, we grant the petition only insofar as it concerns the Appellants' claims against BDO under Section 10(b) and Rule 10b-5—claims addressed by the revisions in this amended opinion. We deny the remainder of the Appellants' petition.